EDITH H. JONES, Chief Judge:
Per Hovem (“Per”), a former student of Klein Independent School District (“KISD”), along with his parents, filed a claim under the Individuals with Disabilities Education Act (“IDEA”), 20 U.S.C. § 1400 et seq., for reimbursement of private school expenses incurred because KISD allegedly failed to provide Per with a free appropriate public education (“FAPE”) while Per was a KISD student. The special hearing officer and the district court found in favor of the Hovems. KISD appeals. The provision of FAPE to a student qualified for special education must be judged by the overall educational benefits received, and not solely by the remediation of the student’s disability. Because this student’s IEPs enabled him to excel, with accommodations for his disability, in a mainstream high school curriculum, KISD complied proeedurally and substantively with IDEA.
*392 I. Background
Appellee Per Hovem is a former student of KISD who suffers from several disabilities in the area of written expression. Born in Norway in 1989, Per moved with his parents to Texas just before beginning the fifth grade. From the start of his enrollment in KISD, Per demonstrated high intelligence (ultimately, a 142 IQ) and above-average performance in math and social studies. Nevertheless, Per demonstrated writing and language difficulties, along with symptoms of attention deficit disorder (“ADD”). The school’s Admission, Review, and Dismissal (“ARD”) committee found that Per’s “writing skills were extremely limited, that his spelling and handwriting skills were very poor, and that he had difficulty in transferring information to paper.” KISD determined that he was eligible for special education services, including an English resource class, as of December 3, 2001. Per and one or both parents met with various KISD teachers and experts in periodic ARD meetings throughout his public school career; all agreed, until the end, on his Individualized Education Program (“IEPs”) prepared to comport with IDEA.
On October 30, 2003, KISD occupational therapist Dawn McDonald issued a report recommending that Per use a portable speller to address his spelling difficulties, a particular area of weakness for him. KISD provided the portable speller to Per for class and home use for the next five years. Beginning in the 2003-2004 school year, KISD provided Per study guides for his classes and hard copies of class notes. He was also permitted to use a computer in class for essay and written responses to assignments, while other students were required to handwrite their work. KISD made various accommodations because of Per’s diagnosed difficulty in transferring information to paper by hand. He was allowed to correct his spelling errors without penalty, to take extra time on written work, and to answer essay test questions orally.
On entering high school, Per began attending regular education classes, albeit with the accommodations noted above, including the ability to type written work at home. Pursuant to his parents’ request, he was placed on a trial basis in a regular English I class (with accommodations). Per and his parents signed the ARD, which stated as Per’s “Transition Plan” that he would graduate Outcome 1 (Regular Graduation) and attend college. In January, 2005, Klein’s educational diagnostician Hilda Castagnos tested Per extensively and found significant disparity between his strong achievement in reading comprehension and relative weakness in areas of written expression, pseudo-word decoding and word reading. Not only did Per pass all his classes, however, he received a 92 in the “trial” semester of English I.
The tenth grade was again academically successful for Per. During the fall of 2005, Per’s mother solicited tutoring from Mr. Greer, an English teacher, to assist Per on the TAKS writing test scheduled in February 2006. Per attended a couple of times but then, without explanation, stopped attending. With accommodations, he completed his courses with above-average grades, passed all sections of the state-mandated TAKS test, including the writing test, and achieved a commended Social Studies ranking.[1]
In September 2006, Per’s ARD committee met to create his IEP for the junior high school year. The IEP listed as among Per’s annual goals that he would *393 receive a passing score in all classes and would advance one grade level, with or without the use of technology or a spelling device. Per was to attend regular education classes but would continue to receive accommodations including extra time to complete written assignments, the opportunity to respond orally to assignments, printed copies of class notes, and the continued use of his portable speller in class and at home. Per expressed his desire to attend NYU following graduation. Significantly, Per’s parents questioned his writing skills. Ms. McDonald, an occupational therapist, was tasked to evaluate his success with assistive technology. She was aware that teachers had not seen Per using his portable speller in their classes, but Per assured her that he could use it. Indeed, he was given and used a portable French speller in his second-year French class. (Later, in the administrative hearing, Per confirmed that he felt uncomfortable using the portable speller in mainstream classes and that it sometimes took a frustratingly long time to use.) Ms. McDonald concluded her evaluation recommending continued use of the portable speller and classroom computers.
Per continued to earn above-average grades in his junior year in the following classes: English, Algebra 2, Chemistry, United States History, French 2, Theater Production, and Art. He was expected to pass the TAKS test administered at the end of the year, and he achieved Commended scores in Social Studies and Science, but he failed the written composition sections, which comprised a portion of the exit level English test.
Responding to this singular failure, the school placed Per in a practical writing course during his senior year. Conducted by Mr. Greer, an experienced teacher, this small class was designed for students who failed the written portion of the ELA TAKS test. The class met daily and systematically covered basic writing skills. Per never attended the additional tutoring Greer offered. At the administrative hearing, however, Per testified that Greer’s approach most closely resembled his later remedial instruction at Landmark School and, as such, was helpful to him. Mr. Greer testified in the hearing that by spring 2008, he thought Per had developed skills sufficient to enable his passing the writing portions of the TAKS test, with the use of a computer.
The ARD committee, meeting in mid-September, had planned Per’s program for his senior year. At that time, with the acquiescence of Per and his parents, his accommodations were reduced to the use of a computer for writing assignments and the portable speller. He would remain in mainstream classes, including Mr. Greer’s practical writing course, and would receive “special education monitoring” of only 30 minutes per semester. No change was made concerning his college-bound intentions. Reinforcing the expectations for Per, two of his SAT scores in October testing were very high: 650 (89th percentile nationally) in Critical Reading and 640 (84th national percentile) in Math. His SAT Writing score, however, was a lowly 340 (6th percentile nationally).
Per and his parents soon became convinced he was incapable, by virtue of his disability in written expression, of performing college-level work. His mother observed him struggle for hours and days while attempting to fill out college application forms and essays. His writing, she said, was so poor that he could not take phone messages at home. He failed both the October and spring re-takes of the ELA TAKS writing test.[2] The family had *394 him re-evaluated and began looking into Landmark School in Boston, which specializes in teaching intelligent disabled students with methods designed to ameliorate their deficiencies in writing, spelling, and phonetics.
Not until March 2008 did a Klein English teacher, although familiar with Per’s accommodations, recognize the extent of Per’s difficulty in writing as she watched him make up an in-class essay assignment for her. Previously, Ms. Marek testified, his major papers had been turned in after being typed at home (like those of other students) and were at least as good as those of his peers. His written classwork was acceptable. His ability to read out loud, she said, was fine. Per never availed himself of graphic organizing materials she furnished the students to assist, inter alia, in framing their college essays, nor did he attend any of her regularly scheduled tutoring sessions.
In order to delay his graduation and preserve his eligibility for Landmark School, which would not accept high school graduates, Per dropped an economics class required for graduation from Klein. Beginning in May, a series of ARD committee meetings occurred in which the Hovems contended that Per had not received a FAPE from Klein, while the Klein participants urged Per to finish the economics class during the summer and graduate— with a waiver of the ELA TAKS test if necessary.[3] Per instead enrolled in Landmark’s summer school program, followed by at least one additional full school year there.
Because Klein refused to reimburse the Hovems for the costs of attending Landmark, they pursued an administrative due process hearing. The hearing officer held, in essence, that Per’s IEPs had been insufficiently tailored to his unique needs because they failed to contain sufficient transitional planning for his entry into college and failed to address his learning disability. The hearing officer concluded Per had not received a FAPE, ie., an educational benefit, because of these IEP procedural deficiencies. Finding the Landmark School an appropriate placement, he ordered the district to reimburse the family for more than two years’ attendance costs.
The district court affirmed the conclusion of the special hearing officer that KISD failed to provide Per with a FAPE and that the Hovems were entitled to reimbursement for the tuition costs, but not residential costs, of the Landmark School. KISD here appeals the decision of the district court.
II. Standard of Review
In cases such as this, “although the district court must accord ‘due weight’ to the hearing officer’s findings, the court must ultimately reach an independent decision based on a preponderance of the evidence.” Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 252 (5th Cir.1997) (citations omitted) (hereafter, “Michael F. ”). Thus, the district court’s review of the special hearing officer’s recommendation is “virtually de novo.” Id.[4]
*395 This court reviews de novo, as a mixed question of law and fact, the district court’s decision that a school district failed to provide a FAPE under IDEA. Teague Indep. Sch. Dist. v. Todd L., 999 F.2d 127, 131 (5th Cir.1993). The district court’s findings of “underlying fact” are reviewed for clear error. Id. “The clear error standard of review ‘precludes reversal of a district court’s [factual] findings unless [the appellate court is] lqft with a definite and firm conviction that a mistake has been committed.’ ” Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P., 582 F.3d 576, 583 (5th Cir.2009) (quoting Jauch v. Nautical Servs., Inc., 470 F.3d 207, 213 (5th Cir.2006) (internal quotation marks and citations omitted)). Whether the student obtained educational benefits from the school’s special education services is a finding of underlying fact. Teague, 999 F.2d at 131. A party attacking the district’s IEP bears the burden of demonstrating its non-compliance with IDEA. Id.
III. Discussion
The central issue raised by KISD is whether Per Hovem received a FAPE consistent with IDEA.
IDEA requires the development of an individualized education program (“IEP”) for each child falling within the purview of IDEA. IEPs are created and periodically reviewed following meetings at which parents, teachers, other school personnel, and educational experts all participate. 20 U.S.C. § 1414(d)(1)(B). The IEP includes a statement of the special education, related services and accommodations the school will provide to the child. 20 U.S.C. § 1414(d)(1)(A). Once school officials and parents agree on the IEP, the school district must put it into effect. 20 U.S.C. § 1414(d)(2)(A). The IDEA requires that school districts allow parents to play a significant role in the development of IEPs for each child with a disability. Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007).
IDEA also requires states to establish procedures to resolve IEP-related disputes between parents and school districts. 20 U.S.C. §§ 1414, 1415. A state must provide parents 'an opportunity to present complaints “with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.” 20 U.S.C. § 1415(b)(6)(A). If such a complaint cannot be resolved to the parents’ satisfaction, they may proceed to an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A). The hearing generally is limited to the identification, evaluation, or educational placement of the child, or to determining whether the child received a FAPE. 20 U.S.C. § 1415(f)(3)(E)(i).
After parents have exhausted the available administrative procedures, any involved party aggrieved by the final decision of the state education agency that conducted the hearing may “bring a civil action with respect to the complaint presented pursuant to this section” in state or federal court. 20 U.S.C. § 1415(i)(2)(A). While the court must receive the record of the administrative proceeding and give it “due weight,” it must also hear any additional evidence the parties present. 20 U.S.C. § 1415(i)(2)(C); Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 *396 L.Ed.2d 690 (1982). IDEA authorizes the court then to issue “appropriate” relief. 20 U.S.C. § 1415(i)(2)(C).
Parents who remove their child from a public school setting because they believe that the public education program fails to provide a FAPE and who place their child in a private school for that reason are entitled to reimbursement if the court holds that the proposed IEP did not provide a FAPE and the private school placement was “appropriate.” School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); see also, 34 C.F.R. 300.148(c); Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 129 S.Ct. 2484, 2496, 174 L.Ed.2d 168 (2009).
IDEA guarantees only a “basic floor” of opportunity, “specifically designed to meet the child’s unique needs, supported by services that will permit him to benéfit from the instruction.” Rowley, 458 U.S. at 188-89, 102 S.Ct. at 3042; see also Richardson Indep. Sch. Dist. v. Michael Z., 580 F.3d 286, 292 (5th Cir.2009) (citations omitted). An IEP need not be the best possible one, nor does it - entitle a disabled child to a program that maximizes the child’s potential. Michael F., 118 F.3d at 247-48. Nevertheless, a school district must provide the student with a meaningful educational benefit. See Juan P., 582 F.3d at 583 (citing Michael F., 118 F.3d at 248 (5th Cir.1997) (citations omitted)).
This court’s de novo review of the adequacy of an IEP is limited to two basic questions: (1) Did the school district comply with the procedural requirements of the IDEA?; and (2) Is the IEP reasonably calculated to enable the student to receive educational benefits? Rowley, 458 U.S. 176, 206-07, 102 S.Ct. at 3051, 73 L.Ed.2d 690 (1982). With respect to the first inquiry, “procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity[.]” Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 812 (5th Cir.2003) (quoting T.S. v. Indep. Sch. Dist. No. 54, 265 F.3d 1090, 1095 (10th Cir.2001)). Four factors guide the court’s analysis of the second inquiry. The court evaluates whether: “(1) the program is individualized on the basis of the student’s assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key ‘stakeholders’; and (4) positive academic and non-academic benefits are demonstrated.” Michael F., 118 F.3d at 253. This Court, however, has “not held that district courts are required to consider them or to weigh them in any particular way.” Michael Z., 580 F.3d at 293.
KISD contends that it met its statutory obligation to provide Per Hovem with a FAPE, as evidenced in part by his better-than-average grades in mainstream general education classes and his continuous, timely progress toward high school graduation. KISD underscores that mainstreaming disabled students into the curriculum with non-disabled students is among the express objectives of the IDEA. 20 U.S.C. § 1412(a)(5)(A). KISD further contends that KISD’s mainstream educational program, coupled with Per’s special accommodations described above, were not required to completely remediate Per’s disability in order to prepare him for post-graduation employment or education.
The Hovems insist that KISD failed to provide Per with a FAPE. They argue that KISD cannot rely on Per’s academic success in areas allegedly not affected by his disability in order to justify KISD’s claim to have provided a FAPE. Rather, they assert that his IEPs were not suffi *397 ciently individualized, the collaborative process was thwarted, and KISD afford no “academic benefit” tailored to his disability.[5]
The district court relied upon the second Rowley prong in determining that KISD failed to provide a FAPE to Per. Considering the four Michael F. factors, the court determined that only the second factor, that the program be administered in the least restrictive environment, partially supported KISD’s position that Per’s IEP was reasonably calculated to provide him with meaningful educational benefit.
Unfortunately, the court’s reasoning is flawed by its legal error in interpreting the “educational benefit” afforded Per solely in terms of weaknesses caused by his learning disability rather than his overall academic record at Klein. Factual findings made under an erroneous view of controlling legal principles are reviewed de novo. Flint Hills Resources LP v. Jag Energy, Inc., 559 F.3d 373, 375 (5th Cir.2009) (quoting Houston Exploration Co. v. Halliburton Energy Servs., Inc., 359 F.3d 777, 779 (5th Cir.2004). In Rowley, the Supreme Court clearly and repeatedly expressed IDEA’S purpose “to confer some educational benefit upon the handicapped child.” 458 U.S. at 200, 102 S.Ct. at 3048 (emphasis added)). The Court quoted the statute as affording “specially designed instruction” and services “to assist a handicapped child to benefit from special education. § 1401(17) (emphasis added).” Id. Rowley declined to fix any single test to determine the adequacy of benefits that must be conferred by IDEA; this court’s Michael F. test fills in some gaps. But Rowley held that for a particular child who had received “substantial” specialized instruction and services to compensate for deafness and “who is performing above average in the regular classrooms of a public school system,” the IEP was sufficient to afford her a FAPE. The Court held, “the IEP, and therefore the personalized instruction, should ... if the child is being educated in the regular classrooms ... be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.” 458 U.S. at 204, 102 S.Ct. at 3049. Rowley not only enjoined lower courts to be “careful to avoid imposing their view of preferable educational methods ...” 458 U.S. at 207, 102 S.Ct. at 3051, but on the facts before it rejected a demand that the particular student be furnished additional auditory services to maximize her potential. 458 U.S. at 198, 102 S.Ct. at 3047.
Nowhere in Rowley is the educational benefit defined exclusively or even primarily in terms of correcting the child’s disability. Certainly, given the wide range of disabilities covered by IDEA, remediation may often be part of an IEP. Behavioral modifications, for instance, immediately come to mind as an example of an IEP strategy that may remediate a disability while also being necessary to confer educational benefits. But the whole educational experience, and its adaptation to confer “benefits” on the child, is the ultimate statutory goal.
From this holistic perspective, we have carefully reviewed Per’s IEPs, his high school educational record, his assessments and the administrative hearing record. Our application of each of the Michael F. factors thus necessarily differs from those of the district court and hearing officer.
First, KISD customized Per’s educational program “on the basis of the student’s *398 assessment and performance.” Michael F., 118 F.3d at 253. The district court overlooked the series of accommodations, listed above, that were accorded Per in all of his classes. While criticizing KISD for not addressing Per’s failure to use the portable speller, the court also overlooks that Per chose not to use it and misinformed the therapist about his intentions. The district court suggests, on one hand, that Per was not held to the same academic standards as other students in general education classes, while on the other hand, the court states that Per was a successful student in spite of, not because of, his IEPs. Aside from the internal inconsistency of these findings, there is no record evidence that Per was assigned a lighter workload: he was instead allowed to prove his mastery of subjects in a different way, using accommodations. The accommodations were tailored to allowing him to undertake regular education classes for which he was obviously well suited apart from his disability.
The fundamental issue as seen by the district court is whether Per’s program, fully acquiesced in by his parents until his senior high school year, was not sufficiently individualized because it failed to enable him to write and spell better. On the facts before us, Rowley is decisive. As has been noted, overall educational benefit, not solely disability remediation, is IDEA’S statutory goal. Per’s IEPs were sufficient because they were “reasonably calculated to enable [Per] to achieve passing marks and advance from grade to grade” in mainstream classes. Rowley, 458 U.S. at 204, 102 S.Ct. at 3049. Moreover, an IEP is not required to maximize a child’s potential, but to provide “a basic floor of opportunity.” See Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 346 (5th Cir.2000) (paraphrasing Rowley). Finally, Rowley emphasizes that courts should not lightly disregard educators’ decisions on the appropriate educational methods to achieve a FAPE. Whether KISD could have remediated Per’s disability more effectively is debatable, but the school district did far more, and offered him far more, than robotic IDEA form-checking to assist his performance in school. And, to say nothing of his generally admirable academic career, the record shows that he made progress in his written expression over the course of high school. His IEPs were sufficiently individualized.
The district court and hearing officer also held the IEPs insufficient because Per’s Transition Plan was “not individualized by any objective, measurable goals” to meet his needs after high school. IDEA requires preparation of Transition Plans covering a child’s post-secondary goals and services. 20 U.S.C. § 1414(d)(l)(A)(i)(VIII)- Under these circumstances, any insufficiency was a procedural violation of IDEA. See Bd. of Educ. v. Ross, 486 F.3d 267, 276 (7th Cir.2007). “Procedural deficiencies alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity” or “infringe [] parents’ opportunity to participate in the IEP process.” Adam J., supra, 328 F.3d at 812. Per’s Transition Plans consistently called for him to graduate Outcome 1 (Regular Graduation). His family failed to avail themselves of KISD’s college application assistance resources when they decided Per was not ready to attend college. The Transition Plans alone did not cause him to “lose an educational opportunity” for college education that the school was required to provide.
Second, there is no real dispute that, because he was enrolled in mainstream classes, Per was furnished specialized educational services in the least restrictive environment. Michael F., 118 F.3d at 253; see also 20 U.S.C. § 1412(a)(5)(A) (requir *399 ing mainstreaming to maximum feasible extent).
Third, Per’s services were provided in a collaborative and coordinated manner by the key “stakeholders.” Michael F., 118 F.3d at 253. The district court’s contrary holding, and the Hovems’ argument on appeal, centers on the parents’ having been “misled” about the extent of Per’s expressive difficulties until he was re-tested in his senior year of high school. Because, they contend, the Hovems were misled about his poor performance in writing and spelling and were lulled into complacency by reports of Per’s intelligence and equable nature, they could not effectively participate in the collaborative process. There is no suggestion that appropriate KISD participants failed to attend ARD meetings, falsified information, or failed to “coordinate” Per’s services or accommodations while he attended school there. Thus, there was no failure of collaboration absent the factual premise that the Hovems were misled. But we must reject that premise. The positive facts that Per was well-liked by his teachers and was regarded as a talented student were in no way misleading, though they may have afforded false comfort regarding his deficiencies. Nevertheless, testing performed in 2005 revealed his deep disorder of written expression co-existing with otherwise superior abilities.[6] Per apparently relied on family members to type papers at home, and his mother knew he would not write phone messages. At some level there may been failures to communicate or of mutual understanding, but the record affords no basis for concluding that KISD misled the Hovems so as to undermine the goal of collaboration for Per’s benefit.
Fourth, and most significant, Michael F. inquires whether positive academic and non-academic benefits accrued to the student. 118 F.3d at 253. This court has stated, “clearly,” evidence of an academic benefit militates in favor of a finding that an IEP is appropriate. Adam J. ex rel. Robert J. v. Keller Indep. Sch., Dist., 328 F.3d 804, 810 (5th Cir.2003). See also Juan P., 582 F.3d 576, 588 (5th Cir.2009) (“educational benefit” one of the most critical factors in assessing an IEP). Viewed from the holistic Rowley perspective, rather than the district court’s narrow perspective of disability remediation, Per obtained a high school level education that would have been sufficient for graduation. . (Indeed, Per is in college now.) As Rowley notes, when a learning disabled student “is being educated in the regular classrooms of the public education system, [an IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.” 458 U.S. at 204, 102 S.Ct. at 3049. This is because grading and advancement in regular classrooms monitor a child’s progress, and the “system itself’ confirms the extent of educational benefit to the child. 458 U.S. at 203, 102 S.Ct. at 3049. This is not a case where Per regressed educationally or could not measure up to ordinary grade-level standards. Compare Juan P., supra, 582 F.3d at 588-90 (IEP insufficient because student would not have advanced without lowered standards), with Bobby R., *400 supra, 200 F.3d at 350 (advancement is not required in every area to obtain an educational benefit from an IEP).
In sum, each of the Michael F. factors, analyzed under the correct legal standard, supports the conclusion that Per’s IEPs were adequate to confer a FAPE. It is regrettable that the sources of Per’s disability of written expression, having been early exposed, were not attacked earlier in his educational career. The school district, however, did not fail to comply with IDEA when the means it used facilitated Per’s substantial achievements in secondary school. Rowley requires no more.

Conclusion

For these reasons, the judgment of the district court is REVERSED and RENDERED.

. During fall 2005, the ADD diagnosis was removed from Per’s profile.

. When asked at the hearing why he left the spring test well before the allotted time had *394 run, Per explained that he thought he had done well enough to pass. He also explained candidly that what he thought was sufficient writing and proofreading could be "totally non-cohesive and non-anything” to an observer unfamiliar with his writing and style.

. Under Texas law, when Per reached 18 in November 2007, he became his own decision-maker for IDEA purposes.

. The district court’s opinion in this case erroneously recited "clear error" as its standard of review when discussing the hearing officer's decision. However, this citation follows nearly two pages of discussion correctly artic *395 ulating the virtually de novo review required of district courts. And following the standards discussion are a 28-page description of the factual record, a 50-page summary of the parties’ legal and factual briefing and 16 pages of the court’s substantive analysis. In context, we attribute no adverse consequence from the passing error.

. The Hovems also challenge various aspects of the IDEA procedures followed by KISD, but these claims were rejected or subsumed in the district court's findings that he did not receive a FAPE.

. Further testing in 2008 dramatized Per's problems by affixing grade level competence estimates in certain areas like "word attack.” KISD challenges grade-level assessments as educationally dubious, and certain of Per's results seem at odds with his demonstrated talents. Rather than attempt to resolve a debate better suited for specialists, we simply note the similarity between the general areas of weakness found in both 2005 and 2008, in testing administered, respectively, by Klein and the parents’ experts. Per's disorder of written expression included his omitting words when writing and difficulties in spelling, legibility, and transferring thoughts to paper.