United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 8, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 03-20446

———————————

ETHAN BRILLON, by his parents and next friends
Gilbert and Rosalie Brillon,

Plaintiff-Appellee-
Cross-Appellant,

versus

KLEIN INDEPENDENT SCHOOL DISTRICT,

Defendant-Appellant-
Cross-Appellee.

Appeals from the United States District Court for
the Southern District of Texas
(USDC No. H-02-CV-1635)

———————————————————————————————

Before KING, Chief Judge, REAVLEY and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

We agree with the decision of the hearing officer regarding Ethan Brillon's

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

second-grade IEP, and reverse the judgment below insofar as it orders relief inconsistent with the decision of the hearing officer.

A.      General IDEA Requirements

The Individuals with Disabilities Education Act (IDEA or Act), 20 U.S.C. §§ 1400-1487, requires that policies and procedures be in place to assure that each disabled student is provided a "free appropriate public education" Id. §§ 1412(a)(1) & 1415(a). These procedures include the right of the parents to participate in the development of an IEP for the child. Id. § 1415(b)(1).[1]

The role of the judiciary under the Act is limited. Our task is not to second-guess the decisions of schools officials and impose our own plans for the education of disabled students, but is instead limited to determining whether those officials have complied with the Act. Flour Bluff Indep. Sch. Dist. v. Katherine M., 91 F.3d 689, 693 (5th Cir. 1996). The IDEA creates a presumption in favor of a school system's educational plan, placing the burden of proof on the party challenging it. Salley v. St. Tammany Parish Sch. Bd., 57 F.3d 458, 467 (5th Cir. 1995).

Under IDEA § 1415(f), parents who have a complaint about the provision of a free appropriate public education can request a due process hearing before the state's education agency designated to conduct such hearings. After administrative review, an appeal can be taken to the district courts, who have jurisdiction to "grant such relief as the

---

[1] In Texas the IEP meetings are known as ARD meetings. ARD stands for Admission, Review and Dismissal.

court determines is appropriate." Id. § 1415(i)(2)(B)(iii). The district court must give "due weight" to the hearing officer's findings, but must ultimately reach an independent decision, thus makings its review of the hearing officer's decision "virtually de novo." Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 347 (5th Cir. 2000) (internal quotation marks omitted). In reviewing the hearing officer's decision, the district court generally examines (1) whether the state complied with procedures set forth in the statute, and (2) whether the IEP developed through those procedures is "reasonably calculated to enable the child to receive educational benefits." Id. at 346 (internal quotation marks and emphasis omitted). Appellate review of the district court's decision is a mixed question of law and fact that we review de novo, but the underlying fact findings of the district court are reviewed for clear error. Id. at 347.

Under the limited judicial oversight described above, the Brillons did not demonstrate a failure of the Klein ISD to comply with the procedures set forth in the IDEA. We next consider whether the IEP developed through those procedures is reasonably calculated to enable the child to receive educational benefits. The IEP, in our view, enabled Ethan to receive educational benefits. The expert opinions of plaintiffs' experts, including Dr. Villa,[2] advocate a position that mainstreaming Ethan would be a better method of providing educational benefits. The courts, however, are not charged to ordering their vision of the best IEP. We have held that "although an IEP must afford

---

[2] We assume without deciding that the district court did not err in admitting and considering the testimony and report of Dr. Villa.

some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (5th Cir. 1993). The dispute centers on whether Ethan's IEP is implemented in the least restrictive environment, which is one of several factors we consider in deciding whether the IEP is reasonably calculated to provide a meaningful educational benefit. Bobby R., 200 F.3d at 347.

B.      Mainstreaming Requirement

Under IDEA's policy of favoring "mainstreaming" of disabled students into the general student population, the Act requires participating states to establish policies and procedures ensuring that

> [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This provision creates "a strong preference in favor of mainstreaming." Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1044 (5th Cir. 1989).

In our view, compliance with the mainstreaming requirement presents a mixed question of law and fact, review is de novo, and, again, the burden is on Plaintiff to establish that this statutory requirement was violated by the IEP. Specifically with respect to the mainstreaming requirement, we have held, consistent with our general approach to review of IDEA cases, that

4

we must keep in mind that Congress left the choice of educational policies and methods where it properly belongs—in the hands of state and local school officials. Our task is not to second-guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the Act.

Id. at 1048.

In Daniel R.R., we employed a flexible approach to deciding whether a school has complied with the mainstreaming requirement. The statutory language, set out above, by its terms also contemplates a flexible approach, requiring mainstreaming to the maximum extent "appropriate," when education can be achieved "satisfactorily." In Daniel R.R., we stated that "[s]chools must retain significant flexibility in educational planning if they truly are to address each child's needs." Id. at 1044.

Daniel R.R. adopted a two-part test, asking "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child," and if not, "whether the school has mainstreamed the child to the maximum extent appropriate." Id. at 1048. To decide the first question, we consider whether the district "has taken steps to accommodate the handicapped child in regular education." Id. We consider whether the efforts to accommodate the disabled student are sufficient, id., bearing in mind that "the Act does not require regular education instructors to devote most or their time to one handicapped child or to modify the regular education program beyond recognition." Id.

Likewise, mainstreaming would be pointless if we forced instructors to modify the regular education curriculum to the extent that the handicapped child is not required to learn any of the skills normally taught in regular

5

education. The child would be receiving special education instruction in the regular education classroom; the only advantage to such an arrangement would be that the child is sitting next to a nonhandicapped student.

Id. at 1049.

As to this factor, the magistrate judge, in a recommendation adopted by the district court (hereinafter the district court), concluded that the school district "took sufficient steps to accommodate Plaintiff. Defendant modified the class assignments, provided a teacher's aide, and worked collaboratively to reinforce concepts." The hearing officer similarly noted that "Ethan's special education teacher has re-taught him the skills being taught in the general education setting." We agree that these efforts to modify the first-grade curriculum to suit Ethan were not "mere token gestures," Daniel R.R., 874 F.2d at 1048, and were legally sufficient. While Plaintiff's experts opined that better accommodations could be undertaken, the district is not required to "provide every conceivable supplementary aid or service to assist the child." Id.

Nevertheless, to implement the goals and objectives that the parties agreed were appropriate for Ethan in the second grade, the 2001 ARD committee reported that the "curriculum would have to be modified beyond recognition."[3] Ethan's second-grade general education teacher likewise testified at the due process hearing that in order to

---

[3]    Importantly, the Brillons agreed to the goals and objectives outlined in the school district's proposed second-grade IEP for Ethan but did not agree that he should receive instruction on those objectives in the special education setting. Once the Brillons challenged the proposed IEP, the school district was required to continue instructing Ethan in the regular education setting for science and social studies, as provided in his first-grade IEP, under the IDEA's "stay-put" provision. See 20 U.S.C. § 1415(j).

implement Ethan's proposed IEP goals and objectives, "the level would be so low that it would change the curriculum beyond recognition," and that she would be forced to operate "a classroom within a class." Unlike Ethan's first-grade IEP, which provided that Ethan would learn two regular education concepts per unit in science and social studies, his second-grade IEP focused on having Ethan achieve developmentally appropriate goals and objectives not specifically drawn from the second-grade curriculum. Therefore, while we agree with the district court that the school district adequately accommodated Ethan in regular education during the first grade, we also conclude that the modifications required to implement Ethan's second-grade IEP goals in the regular education classroom would have been unduly burdensome. See id. at 1048.

We must next examine "whether the child will receive an educational benefit from regular education," focusing "on the student's ability to grasp the essential elements of the regular education curriculum." Id. at 1049. We also consider "the child's overall educational experience in the mainstreamed environment," recognizing that "placing a child in regular education may be detrimental to the child," and that "mainstreaming a child who will suffer from the experience would violate the Act's mandate for a free appropriate education." Id. The district court emphasized that "Plaintiff achieved his IEP goals of learning at least two concepts per unit in science and social studies." The school district responds that Ethan stopped mastering his IEP goals in the second grade, but in any event the fact that Ethan met his own IEP goals, and received at one point high grades under a standard for special education students or his individual IEP, does not

7

undermine the hearing officer's fact findings, amply supported by Ethan's teachers, that (1) the "IEP goals represented a small part of the curriculum the other students were expected to master," (2) Ethan was struggling by the end of first grade, (3) Ethan met his first-grade IEP goals only because "[t]he instruction he received in the general education class was repeated in the special education class," and (4) "Ethan's teachers found that his disabilities profoundly impacted his involvement and progress in the general curriculum," among other findings. The district court did not directly disagree with these findings.

Based on Ethan's high marks in first grade, the district court concluded that Ethan attained an educational benefit from receiving science and social studies instruction in the regular education classroom in first grade. The district court did not assess Ethan's academic progress during the second grade, however, before reaching its conclusion that the school district should have continued to provide his science and social studies education in the regular classroom during that academic year. The evidence in the record demonstrates that Ethan's ability to benefit academically in the regular education setting tapered off in second grade. The hearing officer specifically found, with regard to the second grade, that Ethan was "not making academic progress in the general education setting." Ethan's speech teacher, who had known him for six years, testified that she saw "a breakdown of his overall demeanor" at the end of his first-grade year, which she thought was because "he was over his head." Moreover, Ethan's second-grade general education teacher testified that he was unable to master any of the second-grade TEKS

(state mandated Texas Essential Knowledge and Skills) that she was teaching, and that he was not benefitting academically in her classroom. Thus, we are not persuaded that mainstreaming beyond that contemplated in the school district's proposed second-grade IEP would have provided Ethan an educational benefit, and defer to the school officials in this regard.

We recognized in Daniel R.R. that "academic achievement is not the only purpose of mainstreaming," noting for example that a child "may benefit enormously from the language models that his nonhandicapped peers provide for him." Id. at 1049. The district court found that Ethan's "social benefit from general education is not . . . clear." We similarly find the evidence conflicting on this issue and are not persuaded that the nonacademic benefits of mainstreaming exceed those of special education in Ethan's case. In light of our own uncertainties, the absence of a finding by the district court, and the hearing officer's conclusion that "[t]he evidence overwhelmingly established that Ethan performs better in the special education setting," we presume the school officials struck the appropriate balance in concluding that Ethan should no longer receive science and social studies instruction in the regular education classroom in the second grade. See Daniel R.R., 874 F.2d at 1049 (explaining that the IDEA requires an "examin[ation of] the child's overall education experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child") ; id. at 1050 (explaining that the "appropriate mix" of regular and special education classes "will vary . . . from school year to school year as the child develops").

Finally, we consider "what effect the handicapped child's presence has on the regular classroom environment, and, thus, on the education that the other students are receiving." Id. at 1049. If the disabled student "requires so much of the teacher or the aide's time that the rest of the class suffers, then the balance will tip in favor of placing the child in special education." Id. at 1049-50. While the hearing officer found that "Ethan requires a great deal of time from his teachers and aide," the district court noted testimony from Ethan's teachers that he "was not at all disruptive in the general education class and that he required no more of their attention (with the presence of an aide) than the other students." We do not believe this finding was clearly erroneous. Nevertheless, we conclude that the Brillons did not carry their burden of overcoming the proposed IEP's presumption of correctness by showing that it violated the statutory mainstreaming requirement. As we have explained, implementing Ethan's agreed-to second-grade IEP goals and objectives in the regular education setting would have required the school district to make unduly burdensome modifications to the regular curriculum. In addition, although Ethan remained in the regular education setting for science and social studies under the stay-put IEP (with modifications and services), the evidence demonstrates that he did not benefit academically from his mainstreamed education. Therefore, looking at the totality of the factors set forth in Daniel R.R., and bearing in mind the admonition that difficult educational decisions of the sort presented in this case are generally best left in the hands of school officials and should not be second-guessed, we cannot say that

10

instructing Ethan in science and social studies in a special education setting would have violated the IDEA's mainstreaming requirement in Ethan's case.

Having concluded that the school district's proposed IEP appropriately provided that Ethan receive science and social studies instruction in a special education classroom, "we turn to the next phase of our inquiry": whether the proposed IEP "[would have] mainstreamed [Ethan] to the maximum extent appropriate." Id. at 1051. The school district proposed that Ethan be placed in regular education classes for all non-academic instruction, including: music, physical education, computer, library, programs and assemblies, recess, homeroom, and lunch. Although Ethan's parents would prefer that he interact with his non-disabled peers more extensively, we believe that the school district's proposed IEP placed Ethan in the general education setting "to the maximum extent appropriate." Id.

## C.    Other Issues and Conclusion

The discussion above necessarily means that the cross-appeal by the Brillons must fail, as the cross-appeal seeks even more mainstreaming than that ordered by the district court. Because the Brillons are not prevailing parties, the award of expert witness fees is not appropriate.

Accordingly, the judgment of the district court is reversed insofar as it disagreed with the hearing officer's decision and ordered science and social studies instruction in the regular education setting. The award of expert witness fees is reversed. The judgment

11

is affirmed insofar as it rejected Plaintiff's request that all of Ethan's academic instruction take place in the regular education setting.

AFFIRMED in part, REVERSED in part.