# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 27, 2022

Lyle W. Cayce
Clerk

No. 21-50838

H.W., *by and through her next friend*, JENNIE W,

*Plaintiff—Appellant*,

*versus*

Comal Independent School District,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-344

Before Stewart, Clement, and Elrod, *Circuit Judges*.
Edith Brown Clement, *Circuit Judge*:

H.W. is an elementary school student in the Comal Independent School District (the District). Over the past few years, she has received a variety of special education supports and services because of her disabilities. In March 2020, the District found that despite the accommodations it offered her, H.W. was not making appropriate progress. It accordingly decided to move her from general education into an essential academics program.

H.W.'s mother objected to the District's decision and sought a due process hearing under the IDEA. A hearing officer concluded that the

No. 21-50838

District's proposal was: (1) H.W.'s least restrictive environment; and (2) appropriate in light of her circumstances. H.W. appealed to the United States District Court for the Western District of Texas, which affirmed the hearing officer's decision. She then appealed to us. We AFFIRM.

I.

The Individuals with Disabilities Education Act (IDEA or Act), 20 U.S.C. § 1400 *et seq.*, "offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). The Act was passed to ensure that disabled children are neither excluded from public education nor left to fend for themselves in inappropriate environments. *See Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1038 (5th Cir. 1989). The "cornerstone" of the IDEA is the statutorily mandated "free appropriate public education," or "FAPE." *Id.* at 1043; *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 209 (1982) (holding that the Act establishes a substantive right to a FAPE for qualifying children).

While the FAPE is the cornerstone of the IDEA, the individualized education program (IEP) is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). An IEP is a comprehensive plan that, among other things, sets out "measurable annual goals, including academic and functional goals." *Endrew F.*, 137 S. Ct. at 994 (citing § 1414(d)(1)(A)(i)(I)-(III)). In short, "[t]he IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Rowley*, 458 U.S. at 181).

An IEP is developed at an admission, review, and dismissal committee (ARDC) meeting. *See* § 1414(d)(1)(B). The ARDC generally consists of the child's parents, the child if appropriate, relevant teachers, and district

employees. *See generally id.* The ARDC discusses "the child's present levels of academic achievement and functional performance" and sets future goals/objectives for the child, which the parents sign-off on. *E.R.*, 909 F.3d at 758 (citing § 1414(d)(1)(A)(i)).

In 2010, the Supreme Court held that to meet the IDEA's substantive requirements, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137. S. Ct. at 999. The Court noted that its holding did not necessarily mean that an IEP must aim for "grade-level advancement" to demonstrate progress. *Id.* at 1000. Rather, the Court clarified that a child's educational program "must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.*

Critically, the IDEA's text reflects Congress' "strong preference in favor of mainstreaming," which consequently affects the parameters for developing IEPs. *Daniel R.R.*, 874 F. 2d at 1044. Mainstreaming refers to "[e]ducating a handicapped child in a regular education classroom with nonhandicapped children[.]" *Id.* at 1039. Pursuant to § 1412(5)(B)'s "least restrictive environment" clause, a school district must ensure that its handicapped students are educated with nonhandicapped students to the "maximum extent appropriate." This preference is only overcome "when education in a regular classroom cannot meet the handicapped child's unique needs." *Daniel R.R.*, 874 F.2d at 1045.

## II.

H.W. is an elementary school student in the District. In April 2017, H.W.'s mother, J.W., became concerned that H.W. "may require specially designed instruction." So, she requested a Full and Individual Evaluation (FIE), without cognitive assessment, of her daughter. The FIE report

recommended that H.W. receive "special education supports and services" as a student with primary and secondary disabilities, including Down Syndrome—or Trisomy 21—Hypothyroidism, Attention Deficit Hyperactivity Disorder (ADHD), Asthma, and a speech impairment. Given the report's recommendation, an ARDC formed to develop an IEP for H.W. prior to her kindergarten year—the 2017-2018 academic year. The ARDC agreed to place H.W. in general education with a modified curriculum, inclusion support, and occupational and speech therapy.

### Kindergarten: 2017-2018

H.W. began kindergarten in the Fall of 2017. Throughout her first semester, the District began noticing challenging behaviors. The District alerted H.W.'s parents to these behaviors and enlisted a behavioral analyst to conduct a Functional Behavior Assessment (FBA). The FBA identified four behavioral issues: (1) physical aggression; (2) noncompliance with commands; (3) unexpected verbal utterances; and (4) property destruction. At its annual meeting in the Spring of 2018, the ARDC approved a Behavior Intervention Plan (BIP) aimed at addressing the identified behavioral issues. It also modified H.W.'s curriculum below grade level for the rest of her kindergarten year and her upcoming first-grade year.

### First Grade: 2018-2019

H.W. began first grade in the Fall of 2018. In November 2018, H.W.'s ARDC reconvened to amend her IEP after determining that she was showing inadequate progress in reaching her goals/objectives. The amended IEP provided for more inclusion support, resource instruction for math and

reading,[1] movement breaks, and 20 minutes per week of social skills instruction in a special education setting.

Around this time, H.W.'s parents requested an independent FBA. The District obliged.  The independent analyst, Board Certified Behavior Analyst Anissa Moore, largely agreed with the District's FBA, noting that H.W. "demonstrated maladaptive behaviors that interfered with her learning and/or the learning of others."  She offered some minor recommendations for H.W.'s BIP, including noting that H.W. had an elopement issue that should be addressed.

After receiving Moore's FBA, the District convened an ARDC meeting in February 2019 to modify H.W.'s BIP.  At that meeting, the District proposed increasing H.W.'s resource room time, implementing an alternative curriculum rather than a modified curriculum, and obtaining an expedited FIE in all areas.  H.W.'s parents disagreed with the proposals, and the issues were tabled until the next meeting.

The ARDC then held two meetings in March 2019.  First, it held a meeting to resolve the tabled differences from the February 2019 meeting. Second, it held its annual ARDC meeting to finalize an IEP for H.W.'s upcoming 2019-2020 second-grade year.  During the March meetings, the District proposed that H.W. "receive part or all instruction in a special education setting."  Specifically, it recommended, among other things, increased resource room time, doubled inclusion support, and that half of her speech-language therapy take place in a special education setting.

---

[1] A resource setting is a "special education setting . . . where direct instruction can be provided to the student at a different ability level than the general education grade level."

No. 21-50838

The District based its recommendation on four grounds: (1) general education prohibited H.W. from meeting her IEP goals/objectives "even though supplementary aids and services [were] used"; (2) H.W.'s competency was significantly below grade level; (3) modifications required for H.W. to achieve her IEP goals/objectives could not be implemented without "eliminating essential components of the general curriculum/activity"; and (4) H.W.'s speech impairment necessitated "a less distracting environment than the general education classroom." The ARDC concluded that the benefits of removal outweighed any potentially harmful effects. Further, it noted that H.W. would "have the opportunity to participate with students without disabilities in all nonacademic, extracurricular, and other activities[.]"

H.W.'s parents disagreed with the proposed alternative curriculum and the District relented. The ARDC eventually agreed on placing H.W. in extended school year (ESY) services. ESY services are special education services that are provided "beyond the normal school year." The services are required if, "in one or more critical areas addressed in the current IEP goals/objectives, the student has exhibited, or reasonably may be expected to exhibit, severe or substantial regression that cannot be recouped within a reasonable period of time." It also agreed on modifying her curriculum to a "pre-K to prerequisite skills level." H.W. was subsequently promoted to second grade even though she received a mark indicating "Below Grade Level and Requires Urgent Intervention" in every academic area.

*Second Grade: 2019-2020*

H.W. began second grade in the Fall of 2019. At that time, the ARDC revised her IEP to significantly increase her inclusion support and provide for more movement breaks. The District's staff maintained daily progress reports to track H.W.'s performance. Based on the data it was collecting, the

No. 21-50838

District informed H.W.'s parents that she was "having trouble making academic progress or regressing." It recommended a cognitive evaluation to ascertain her "current levels of intellectual functioning."

The ARDC met on November 7, 2019. J.W. withheld consent for cognitive testing but agreed to lower H.W.'s mastery criteria in math, reading, and writing—despite previously requesting that the District increase the rigor of H.W.'s goals. The ARDC also agreed on increasing her amount of special education instruction. Thus, H.W.'s newly amended IEP provided for an increase in resource room time and for three-quarters of her speech-language therapy in a special education setting.

After the November 2019 modifications, special education staff members noted that despite the modifications, H.W. was making inconsistent or inadequate progress toward meeting many of her goals and was failing every subject. Further, the District noted that the rigors of the general education environment were triggering some of her challenging behaviors. These findings led to the proposed IEP that is at the center of this litigation.

*The Proposed Blended Placement IEP: 2020-2021*

On March 4, 2020, the ARDC convened to develop H.W.'s IEP for the 2020-2021 third grade school year. The District again proposed that H.W. "receive part or all instruction in a special education setting." Specifically, the District recommended that she be removed from general education into an Essential Academics setting—or a self-contained "special education classroom that provides different formats of instruction," such as "repetitive hands-on activities" and an alternative curriculum with no typically developing students.

The District believed removal was warranted on four grounds, one of which differed from the March 2019 justifications: (1) H.W.'s competency

7

was significantly below grade level; (2) modifications required for her to achieve her IEP goals could not be implemented without "eliminating essential components of the general curriculum/activity"; (3) her behavior required a specialized environment for the implementation of her IEP and BIP; and (4) her speech impairment necessitated "a less distracting environment than the general education classroom." In other words, the District believed that H.W. could not progress toward her modified curriculum or IEP goals in the general education curriculum.

The District reiterated that it made "efforts to modify and supplement [H.W.'s] participation in the general education setting . . ." but that despite those efforts, H.W. still could not "make progress towards her goals." It further noted that H.W. was having a detrimental impact on her peers because she often grunted, struck at other students, and swiped materials off desks. On the other hand, the District found that "there ha[d] been more progress noted during the times [H.W.] receive[d] instruction in the resource classroom[, which could have been] attributed to the small group environment and fewer distractions." And it reiterated that H.W. would "have the opportunity to participate with students without disabilities in all nonacademic, extracurricular, and other activities[.]" The proposed blended placement IEP provided for: 235 minutes per day in special education (plus additional time for speech) and 150 minutes per day in general education.

H.W.'s parents disagreed with the proposed blended placement IEP. Instead, J.W. requested an Independent Educational Evaluation (IEE) to supplement the data the ARDC was considering. The District accepted J.W.'s request. With a lack of agreement, the District then sent H.W.'s parents a prior written notice on May 28, 2020, stating that it would soon implement the blended placement IEP. On August 20, 2020, the District

reminded H.W.'s parents about the pending IEP implementation, which would occur on August 31, 2020.

On August 31, 2020, J.W. filed an administrative complaint requesting a due process hearing to challenge the proposed IEP as a denial of a FAPE. A prehearing conference was held on October 22, 2020, and the due process hearing was scheduled to begin on January 19, 2021. A speech and language IEE was subsequently conducted on January 3, 2021. The evaluator, Speech-Language Pathologist Sabina Duhon, concluded that the general education environment was ideal for H.W. because it would give her more access to her grade level peers.

On January 6, 2021, Dr. Laura Eskridge, a licensed psychologist, conducted J.W.'s requested behavioral, intellectual, and academic IEE virtually due to the COVID-19 pandemic. Doctor Eskridge opined that H.W.'s current pre-blended placement programming "appear[ed] appropriate for her needs[,]" and that placing her in "a more restrictive environment appear[ed] inappropriate for [her] at [that] time."

A due process hearing was then held from January 19 to January 21, 2021. The hearing officer concluded that the District did not deny H.W. a FAPE because the proposed blended placement IEP was, among other things: (1) H.W.'s least restrictive environment; and (2) appropriate in light of her circumstances. H.W. appealed the hearing officer's decision to the United States District Court for the Western District of Texas on April 6, 2021. After reviewing the administrative record and party briefing, the district court affirmed the hearing officer's decision. H.W. timely appealed.

## III.

Under the IDEA, a district court reviews a hearing officer's decision "virtually de novo." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016) (citation omitted); *cf. id.* at 961 (noting that a

district court must accord due weight to a hearing officer's findings). A district court's decision "is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with [the] IDEA's processes and that the child's educational needs have been appropriately addressed." *Id.* at 967 (citation omitted). Given the uniqueness of this summary judgment standard, we have held that our own standard of review must adapt. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997).

We review mixed questions of law and fact, such as whether the district court correctly decided whether a local school district's IEP or its proposed alternative placement was appropriate, de novo. *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 762 (5th Cir. 2018) (per curiam). We review findings of fact, such as "findings that a disabled student obtained educational benefits under an IEP," for clear error. *Id.* (citation omitted). "The clear error standard precludes reversal of a district court's findings unless we are 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 766 (citation omitted). Because the IDEA "creates a presumption in favor of a school system's educational plan," the burden of proof rests on the party challenging that plan. *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). Importantly, it is not our role "to second guess state and local policy decisions; rather it is the narrow one of determining whether state and local school officials have complied with the Act." *Id.* (citation omitted).

## IV.

H.W. asserts that her IEP erroneously strips her of a FAPE by removing her from the general education classroom and placing her in an overly restrictive environment. The District counters that its proposed IEP

is appropriate in light of her circumstances and that it placed her in her least restrictive environment. The District has the better argument.

We look to four factors when reviewing "whether an IEP is reasonably calculated to provide a meaningful education benefit under the IDEA"; namely, whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Michael F.*, 118 F.3d at 253; *see also E.R.*, 909 F.3d at 765 ("Our court's four *Michael F.* factors and the Supreme Court's holding in *Endrew F.* do not conflict."). While we have "never specified precisely how these factors must be weighed," *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 293 (5th Cir. 2009), we have "long held that the fourth factor is critical." *Renee J. ex rel. C.J. v. Hous. Indep. Sch. Dist.*, 913 F.3d 523, 529 (5th Cir. 2019) (citation omitted).

When the issue before us is whether the Act's mainstreaming requirement has been met, the second *Michael F.* factor is guided by the two-part test set out in *Daniel R.R. See R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1013 (5th Cir. 2010). Under that test, we must first ask "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Daniel R.R.*, 874 F.2d at 1048 (citing § 1412(5)(B)). If the answer is no, and the school "intends to provide special education or to remove the child from regular education," we then ask "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* (citing § 1412(5)(B)). A variety of factors inform us at each stage of this inquiry, though the factors are by no means exhaustive, nor a single factor dispositive. *Id.* Rather, each case must be reviewed through an "individualized, fact-specific inquiry." *Id.*

No. 21-50838

This case revolves around the least restrictive environment/ mainstreaming inquiry. Consequently, although we briefly address *Michael F.* factors 1, 3, and 4 at the outset,[2] the majority of our analysis will concern *Michael F.* factor 2 and the corresponding *Daniel R.R.* inquiry.

## A.

H.W.'s IEP was undoubtedly individualized. Between kindergarten and the beginning of her third-grade year, the ARDC developed at least ten IEPS and/or IEP amendments. These IEPs accounted for an FIE, FBAs and corresponding BIPs, and numerous progress reports. The ARDC showed that it was vigilant in its evaluation, observation, and assessment of H.W. and that it routinely updated H.W.'s IEP to reflect its individualized findings.

The ARDC overseeing H.W.'s IEPs was also comprised of key stakeholders who collaborated to reach the best possible decisions for H.W. For example, the ARDC members and participants who reviewed the proposed blended placement IEP were J.W., H.W.'s grandmother, a campus administrator, two general education teachers, a special education teacher, a licensed specialist in school psychology, two speech-language pathologists, an occupational therapist, a behavioral specialist, a coordinator for elementary special education services, and two parent advocates. This composition was common as a variety of family members, educators, specialists, and administrators frequently comprised H.W.'s ARDC.

Finally, it is undisputed that H.W. received *some* academic and non-academic benefits from being educated in the general education classroom. The District concedes as much. The extent and meaningfulness of that

---

[2] The District summarily asserts that H.W. abandoned any challenge "to the lion's share of *Michael F.* factors and limits her appeal to the second factor." We disagree and address each factor.

benefit, however, is disputed.    We consider that dispute (which is encompassed in the first *Daniel R.R.* factor) along with the second *Michael F.* factor in the next section.

## B.

We must now determine whether the proposed blended placement IEP is H.W.'s least restrictive environment.  As previously stated, we must first ask if H.W. could be satisfactorily educated in the regular classroom with supplemental aids and services.  *Daniel R.R.*, 874 F.2d at 1048.  If the answer is no, then we must ask whether the District mainstreamed H.W. "to the maximum extent appropriate."  *Id.*

### i.

When deciding "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child[,]" we consider several non-exhaustive factors.  *Daniel R.R.*, 874 F.2d at 1048.  Those factors include:

> (1) "whether the state has taken steps to accommodate the handicapped child in regular education";
>
> (2) "whether the child will receive an educational benefit from regular education";
>
> (3) "the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child"; and
>
> (4) "what effect the handicapped child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving."

*Id.* at 1048–49.

*The District took steps to accommodate H.W.*

It is apparent from the record that the District tried to accommodate H.W. in the general education setting. The next question is whether the District's efforts were sufficient. *Id.* at 1048. The answer is yes. The District provided H.W. with an FIE before she started kindergarten and, based on the results, implemented a modified curriculum with inclusion support and therapy. After noticing behavioral issues, it ordered an FBA, developed a BIP, and amended her IEP to address those issues. The ARDC also further modified H.W.'s curriculum while keeping her in general education.

Throughout H.W.'s first- and second-grade years, the ARDC repeatedly amended H.W.'s IEP to address her inadequate progress. It kept her in general education while increasing her inclusion support, resource room time, and special education components; addressing her behavioral problems; and providing her with ESY services. It was only after multiple attempts at keeping H.W. in a general education classroom that the District proposed the blended placement IEP. These are not the "mere token gestures" that *Daniel R.R.* prohibits. *Id.* at 1048. Quite the opposite, the District provided H.W. with individualized, one-on-one care that it frequently adapted to meet her evolving needs.

*H.W. did not receive meaningful academic and non-academic benefits in general education.*

The next factors to consider are: (1) whether H.W. was receiving an educational benefit from the District's efforts; and (2) H.W.'s overall experience in general education when "balancing the benefits of regular and special education for [her]." *Id.* at 1048–49. The parties agree that H.W. was receiving *some* academic and non-academic benefits in general education; however, they disagree on whether those benefits were *meaningful*.

To determine whether H.W. was receiving an educational benefit in general education, we must focus on her "ability to grasp the essential elements of the regular education curriculum." *Id.* at 1049. This means that we must "pay close attention to the nature and severity of [her] handicap as well as to the curriculum and goals of the regular education class." *Id.* And, again, we cannot be satisfied with a "de minimis" educational benefit; instead, we must ascertain "progress appropriate in light of [her] circumstances." *Endrew F.*, 137. S. Ct. at 999.

This leads us to the critical question in this case: how should we measure H.W.'s "progress"? Put another way: should we primarily rely on H.W.'s progress toward her IEP goals or instead look to her overall academic record when determining whether she is making appropriate progress? H.W. advocates for the former and the District advocates for the latter. We agree with the District and write to provide clarity on this matter.

For a child fully integrated into general education, an IEP is appropriate when it is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204. If grade-level enhancement "is not 'a reasonable prospect for the child,'" such as in H.W.'s case, then the educational program for a disabled student must be "appropriately ambitious in light of [her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *R.S. ex rel. Ruth B. v. Highland Park Indep. Sch. Dist.*, 951 F.3d 319, 330 (5th Cir. 2020) (per curiam) (quoting *Endrew F.*, 137 S. Ct. at 1000).

This does not mean that grade-level advancement and tests scores cannot be considered when determining whether a student in the second category is appropriately progressing. Advancement and test scores are still valid, important metrics that we can consider. *See Leigh Ann H. v. Riesel*

*Indep. Sch. Dist.*, 18 F. 4th 788, 798 n.12 (5th Cir. 2021) (Elrod, J.); *D.C. v. Klein Indep. Sch. Dist.*, 860 F. App'x 894, 904–05 (5th Cir. 2021); *Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349–50 (5th Cir. 2000). It simply means that test scores and advancement from grade to grade are not *per se* indicators for either removal or the provision of a FAPE. *See Endrew F.*, 137 S. Ct. at 1000 & n.2.

Further, we have held that "[a] disabled child's development should be measured not by his relation to the rest of the class, but rather with respect to the individual student." *Bobby R.*, 200 F.3d at 349; *see also Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 589 (5th Cir. 2009) (holding the same). In fact, *Daniel R.R.* held that the IDEA requires states to "tolerate educational differences" and "accepts the notion that handicapped students will participate in regular education but that some of them will not benefit as much as nonhandicapped students will." 874 F.2d at 1047; *see id.* ("[W]e cannot predicate access to regular education on a child's ability to perform on par with nonhandicapped children."); *but see id.* at 1049 (holding that "mainstreaming would be pointless if we forced instructors to modify the regular education curriculum to the extent that the handicapped child is not required to learn any of the skills normally taught in regular education").

Reading some tension or ambiguities into our precedents, and relying on an out-of-circuit case, H.W. asserts that the court should adopt an IEP-centric test to measure the adequacy of her educational progress. According to H.W., *Hovem; A.B. ex rel. Jamie B. v. Clear Creek Independent School District*, 787 F. App'x 217 (5th Cir. 2019) (per curiam) (unpublished); and a Sixth Circuit case, *L.H. v. Hamilton County Department of Education*, 900 F.3d 779, 793 (6th Cir. 2018), all stand for the proposition that that "the IEP is precisely the proper yardstick for measurement of progress." H.W. is incorrect.

Consider first the cases H.W. relies on to argue for an IEP-centric test. According to H.W., *Hovem* held that "an IEP cannot be held inadequate merely because it does not address all of the specific weaknesses a child might have by virtue of that child's disability." In one sense, H.W. is correct. *Hovem* did hold that an IEP that did not lead to improved writing and spelling skills—the disabilities at issue—still provided a FAPE. 690 F.3d at 397. But H.W.'s conclusion that *Hovem* consequently made the IEP the proper benchmark for measuring progress does not follow.

*Hovem* held that the underlying district court legally erred when it focused on disability remediation rather than overall academic record. *Id.* Relying on *Rowley*, we concluded that the "educational benefit" inquiry cannot be defined "exclusively or even primarily in terms of correcting the child's disability." *Id.* Rather, the inquiry should properly focus on a holistic, overall academic record perspective instead of a narrow, disability remediation perspective. *Id.* at 399; *see also id.* at 406 (Stewart, J., dissenting) ("[T]he majority reasons that educational benefit in the area of disability is not a primary concern under the IDEA.").

*A.B.*, an unpublished case, is likely unavailing. There, the school district argued that A.B.'s progress "was entirely the result of his modified curriculum and paraprofessional support, such that his success had nothing to do with his being in a general-education environment." *A.B.*, 787 F. App'x at 222. We rejected that argument, holding that A.B. "[did] not need to demonstrate that he was receiving a special benefit *from* the general-education setting in order to merit being placed there," because the "preference for general education is built into the IDEA." *Id.* at 223–24. *A.B.* certainly stands for the proposition that the effect that special education support and services are having on a student's academic progress must be considered. But it does not mean that the IEP is *the* litmus test for measuring said progress.

Finally, H.W. turns to the Sixth Circuit's holding in *L.H.* to support her IEP-centric test.  There, the Sixth Circuit held that "the appropriate [mainstreaming] yardstick is whether the child, with appropriate supplemental aids and services, can make progress toward the [ ] IEP['s] goals in the regular education setting."  900 F.3d at 793 (citation omitted).  We have never adopted such a test and *L.H.* is obviously not binding on us.  More importantly, as we demonstrate next, *L.H.*'s test is at odds with our holistic approach.  *See, e.g.*, *Hovem*, 690 F.3d at 397; *Bobby R.*, 200 F.3d at 349; *Michael F.*, 118 F.3d at 253; *Daniel R.R.*, 874 F.2d at 1047.

Despite an attempt to read tension into our precedents, our precedents—and the Supreme Court's for that matter—favor an overall academic record-based review.  *Rowley*, *Endrew F.*, *Michael F.*, *Daniel R.R.*, *Hovem*, *A.B.*, *D.C.*, and the like all have one thing in common: they require courts to review each student's case in a fact-intensive, individualized, holistic manner.  *Hovem* places overall academic record, rather than disability remediation, at the forefront.  690 F.3d at 398.  *A.B.* states that special education support and services cannot be discounted.  787 F. App'x at 222–23.  *Endrew F.* focuses on individual, appropriate progress.  137 S. Ct. at 999.  *Daniel R.R.* rejects the temptation to compare a disabled student to her typically developing peers.  874 F. 2d at 1047.  And *D.C.* says that while test scores and the like are not dispositive, they are important metrics.  860 F. App'x at 904–05.

So, here, rather than assessing whether H.W. is receiving an educational benefit by comparing her progress to her typically developing peers, we must assess H.W.'s individual progress.  *Daniel R.R.*, 847 F.2d at 1047.  To make this judgment, we must look to her overall academic success, not whether her disability has been remedied.  *Hovem*, 690 F.3d at 397–99.  The extent to which H.W. has progressed on her IEP goals and objectives, as well as her test scores and percentile rankings, can aid this process, but no

one factor can overwhelm it. *D.C.*, 860 F. App'x at 904–05; *see also Hovem*, 690 F.3d at 397 (considering the student's "IEPs, his high school educational record, his assessments[,] and the administrative hearing record); *A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 691 (5th Cir. 2020) (Stewart, J.) (Clement, J., concurring) (considering overall academic progress and IEP progress reports); *P.P. v. Nw. Indep. Sch. Dist.*, 839 F. App'x 848, 856 (5th Cir. 2020) (per curiam) (unpublished) (same). And while we cannot affirm the District's proposed blended placement IEP simply because H.W. is falling behind her typically developing peers, we can do so if we agree that her "individual needs" make removal appropriate. *Daniel R.R.*, 847 F.2d at 1049.

Here, the district court correctly reviewed H.W.'s overall academic record and found that she was not making appropriate progress in light of her circumstances. Indeed, that record—which includes test scores, percentile rankings, IEP progress reports, testimony from qualified professionals, and the like—reveals that H.W. could not "grasp the essential elements of the regular education curriculum." *Daniel R.R.*, 874 F.2d at 1049.

Start with H.W.'s progress reports for March 2, 2020—H.W.'s most persuasive evidence. The progress reports tracked H.W's progress toward 17 IEP goals/objectives. H.W. "mastered" 11 of those 17 goals. While H.W. undoubtedly mastered many of her IEP goals, she was still unable to make consistent and/or appropriate progress toward several of those goals in a general education setting. The ARDC frequently reconvened to try and help her meet her goals. It gradually increased the assistance afforded to her. And it even lowered her mastery criteria with her parent's consent—an implicit acknowledgement from H.W.'s parents that she was making inadequate progress. Yet H.W. still struggled in many regards. What is more, some of those goals were not mastered until October 2020, seven months *after* the blended placement IEP was proposed. Although later completion does not

negate H.W.'s mastery, it does provide even more clarity for why the District proposed the blended placement IEP.

As we previously stated, progress toward IEP goals is not dispositive. Even though H.W. ultimately mastered many of her goals, she was still regressing and falling behind in other areas, such as test scores and percentile rankings. For instance, from the spring of first grade to the winter of second grade, H.W. declined in percentage correct on math and reading questions on the Universal Screener Test. Similarly, the same test showed that H.W. was in the first percentile in every category for first and second grade. As the District argues, these test scores and percentile rankings had real classroom consequences; namely, that H.W. could no longer functionally engage with her peers or the general education curriculum.

H.W.'s second-grade year is illustrative. For that year, her curriculum had to be modified from a second-grade level to a pre-kindergarten or prerequisite level. Even with a significantly modified curriculum and constant one-on-one assistance, she failed every subject and fell further behind the general education curriculum. And the record reveals numerous examples of the disparity between her modified curriculum and the general education curriculum. Contrary to H.W.'s protestations, this remark is not a comparison of her to her typically developing peers; rather, it is a statement of her factual stagnation.

H.W.'s overall educational experience also favors the District's decision. Both the district court and the hearing officer found, and the record supports, that H.W.'s overall "benefit from the regular classroom setting was minimal at best"; she was "less aggressive and exhibited her disruptive behaviors less in the special education setting"; and her "abilities, along with her needs for attention, consistent prompts, redirection, and reinforcement, and her limited engagement with her peers in the regular classroom activities

emphasize her need for specialized instruction." The district court did note that H.W. could potentially "benefit from the language models of her peers in the regular education setting or in other ways." Nevertheless, it correctly concluded that the preponderance of the evidence supported the District's decision.

### *H.W. had a disruptive effect on the classroom.*

We must also consider what effect, if any, H.W. had on the general education classroom. The hearing officer and district court found that although there was no direct evidence of H.W. impairing the education of other students, the totality of the evidence established that she had a "negative, detrimental" effect on others. H.W. argues that the district court and hearing officer erred in finding that she had a disruptive effect on others. Her arguments again fall short.

First, the record shows that H.W. occasionally bit, kicked, or struck staff members or teachers resulting in the need for a trip to the school nurse. Her proposed blended placement IEP further states that she hit, bit, and kicked staff and peers; yelled, screamed, moaned, and grunted in the classroom; and swiped materials off desks. That document also describes other inappropriate behavior that eventually ceased. It concludes by stating that the challenging behaviors are "least likely to occur during movement breaks, resource time, and recess." Testimony at the due process hearing confirmed the contents of H.W.'s proposed IEP. And, contrary to her arguments on appeal, the March 2020 proposal evinces that the District did note her problematic behaviors as a ground for removal.

H.W. also argues that the District should have exercised other options to dispel any behavioral issues rather than proposing a blended placement. H.W. concedes that the District tried to implement some of the very options she recommends. Still, she asks us for more. It is H.W.'s burden to establish

that the District's decision violates the IDEA. As *Endrew F.* stated, our review of an IEP must be limited to whether the IEP is *reasonable*, not ideal. 137 S. Ct. at 999. Were it otherwise, we would be permitted to usurp the authority of state and local school officials and rewrite policy as we see fit. *White*, 343 F.3d at 377. But that is not the case. Our review is narrow, limited to simply deciding whether school officials have complied with the Act. *Id.* H.W. has not carried her burden to show that the District's decision violated the Act; thus, our analysis must end here.[3]

ii.

Finally, we consider the second *Daniel R.R.* factor: whether the District mainstreamed H.W. to the maximum extent appropriate. H.W. asserts that the district court erred because the proposed blended placement IEP does not satisfy the IDEA's least restrictive environment mandate. She argues that her proposed IEP is analogous to the IEP in *A.B.*, which we held to violate the IDEA, and concludes that we should reverse. We decline that invitation.

The IDEA requires "schools to offer a continuum of services." *Daniel R.R.*, 874 F.2d at 1050 (citations omitted). This means that schools "must take intermediate steps where appropriate[.]" *Id.* (footnote omitted). Because mainstreaming determinations require independent, case-by-case evaluations, "[t]he appropriate mix [of general to special education classes] will vary from child to child." *Id.* To comply with the IDEA, a student's

---

[3] Contrary to H.W.'s arguments on appeal, the district court did not predicate her access to general education on her ability to perform on par with her typically developing peers. Further, we need not rely on any testimony discussing the "class within a class" argument. *See Lauren C. ex rel. Tracey K. v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 374 (5th Cir. 2018) (holding that we could affirm on any ground supported by the record).

plan must provide for exposure to nonhandicapped students to the maximum extent appropriate.

In *A.B.*, we held that A.B. could be, and had been, "educated satisfactorily in the regular classroom," and that his removal from general education consequently violated the IDEA. 787 F. App'x at 223. We reached this holding based, in part, on three of the underlying district court's findings: (1) A.B. received positive academic and non-academic benefits in general education; (2) he exhibited more progress in a general education than special education setting; and (3) he resolved his behavioral issues. *Id.* at 222–23. We also compared A.B. to the student in *Brillon v. Klein Independent School District*, 100 F. App'x 309 (5th Cir. 2009) (per curiam) (unpublished).

In *Brillon*, we held that a student was properly placed in special education when he: (1) was not making academic progress in the general education setting and received an undiscernible social benefit from education among typically developing peers; (2) performed better in the special education setting; and (3) required a modified curriculum that changed the general education curriculum "beyond recognition." *Id.* at 313–14. Noting that the student's individual circumstances were critical to our holding in *Brillon*, and that those circumstances were not present in *A.B.*, we held that unlike the student in *Brillon*, A.B. could not be removed to a special education setting. *A.B.*, 787 F. App'x at 223.

H.W. asserts that she is more like the student in *A.B.* than the student in *Brillon*. That is simply not the case. As the District points out, the similarities between H.W. and A.B. begin and end with their heavily modified curriculums, inclusion support, and inability to maintain the pace of their peers. Unlike A.B., though, H.W. received minimal academic benefit. Further, testimony evidenced that she often performed better in the resource room and the special education speech-language room than in general

education settings.  Finally, while A.B. was primarily moved for behavioral issues that subsided, H.W. was primarily moved for academic issues and many of her behavioral issues have not subsided.  H.W.'s placement is not analogous to *A.B.*—it is analogous to *Brillon*.

*A.B.* and *Brillon* aside, the record establishes that H.W. was placed in her least restrictive environment.  H.W.'s IEP was incrementally amended over a course of approximately three years.  Each amendment provided for either more inclusion support, special education, or resource room time.  Although H.W. occasionally saw glimpses of progress, the bottom line was one of stagnation, minimal improvement, and, at times, even regression.  The proposed blended placement IEP was the next logical step when the District found that H.W. was still not improving.  H.W. has not carried her burden to establish that the District's decision violated the IDEA.

*     *     *

AFFIRMED.