# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 23, 2023

Lyle W. Cayce
Clerk

No. 22-10443

B. S., B/N/F Justin S.; Meghan S.,

*Plaintiff—Appellant*,

*versus*

Waxahachie Independent School District; Derrick
Young, Individually and in his Official Capacity; Mike
Lewis, Individually and in his Official Capacity; City
of Waxahachie,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-2724

Before Davis, Haynes, and Graves, *Circuit Judges*.
Per Curiam:*

Plaintiffs-Appellants, B.S., by his next friends and parents, Justin S. and Meghan S., brought a state administrative complaint against the Waxahachie School District ("the School District"), alleging that the School District failed to provide B.S. with a free and appropriate public education

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-10443

"FAPE," as required by the Individuals with Disabilities Education Act ("IDEA").

Following a state administrative hearing, a Special Education Hearing Officer concluded that the School District had provided B.S. with a FAPE during his third-grade year. B.S. subsequently challenged the ruling in federal district court. He also brought an intentional discrimination claim against the City of Waxahachie and its officers, Derrick Young and Mike Lewis (collectively "the City"), under the Americans with Disabilities Act ("ADA"). The district court affirmed the hearing officer's decision on cross motions for summary judgment and dismissed B.S.'s remaining claims. For the following reasons, we AFFIRM.

## I.  BACKGROUND

B.S. enrolled in the School District as a kindergartener in the Fall of 2013. In October of that year, the School District administered a Full and Individual Evaluation ("FIE") to determine whether B.S. had a disability as defined by the IDEA, and if so, whether he required special education services. Based on this evaluation, the School District certified that B.S. qualified for special education as a student with autism and a speech impairment. Throughout the following years, B.S. struggled with behavioral issues—particularly physical and verbal aggression—during the school day.

This appeal arises from the 2016-2017 school year when B.S. was eight years old and in the third grade. Pursuant to B.S.'s 2015 Individual Education Plan ("IEP"), he began the year in a special education classroom with teacher Tracy Gooch for English, language arts, reading, science, social studies, and social skills. B.S. attended his math and "specials" classes (*i.e.*, art, PE, music) in a general-education setting.

B.S.'s mother testified at the due process hearing that B.S.'s "first month [of third grade] was good" in terms of his behavior, but that in

2

September he began having behavioral incidents. These incidents are detailed in B.S.'s behavioral "choice sheets," which were filled out by his special education teacher, Ms. Gooch, each day. B.S.'s choice sheets show that from August 22, 2016, through October 11, 2016, he engaged in nine documented behavioral incidents.[1] Two of those incidents rose to the level of requiring a disciplinary incident report. Because Ms. Gooch had to restrain B.S. during one of those incidents, the School District filled out a "Written Summary of Restraint Use" that was placed in his special education eligibility folder.

On October 7, 2016, the School District completed its three-year reevaluation of B.S.'s FIE. The results from B.S.'s reevaluation show that he has a below-average IQ of seventy-seven and that his present levels of academic achievement were "below average." A licensed specialist in school psychology noted in B.S.'s FIE that he continued "to demonstrate a profile of behavior consistent with a diagnosis of autism," but "has made marked strides in behavior since the time of his initial autism evaluation."

On October 11, 2016, the School District held a meeting with a team of qualified professionals, known in Texas as an Admission, Review, and Dismissal Committee ("ARD Committee"), to review B.S.'s progress and update his IEP[2] for the 2016-2017 school year. Although B.S.'s parents are

---

[1] Some of those behavioral incidents included: (1) spitting on another student; (2) failing to follow directions; (3) disrespecting students and staff and hitting a staff member; (4) running in the hallways and using "unkind" words; (5) trying to stab another student with a pencil, using foul language, slapping a student with a ruler, failing to follow directions, and hitting a teacher; (6) hitting students, and climbing fences; (6) using a loud voice to seek attention and running out of class.

[2] An IEP is a "'written statement' that outlines how special education and related services will be delivered to . . . [a particular] child," and is reviewed at least annually by the ARD Committee. *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 209 (5th Cir. 2019) (quoting 20 U.S.C. § 1414(d)(1)(A)); 20 U.S.C. § 1414(d)(4)(A)(i).

No. 22-10443

members of the ARD Committee,[3] they were unable to attend the meeting and gave permission for the Committee to proceed without them.

At the meeting, the ARD Committee enumerated ten annual goals for B.S. in English, language arts, reading, math, social studies, science, adaptive behavior, and speech therapy. In terms of B.S.'s academics, the ARD Committee decided to remove B.S. from general education math and instead place him in a "modified math" in a special education classroom with younger students. The ARD Committee also discussed concerns about B.S.'s behavior, noting that he had "some behavior challenges at times due to academic frustration." Due to these concerns, the Committee included a behavior management accommodation in B.S.'s IEP with strategies to manage his behavior, including: taking frequent breaks and giving him the opportunity to walk/run outside with staff. However, because the Committee decided that B.S.'s behavior did not impede his own learning or that of others, it declined to implement a behavior intervention plan ("BIP").

After the ARD Committee meeting, B.S. began attending Lora Lockamy's special education classroom with younger students each day for thirty minutes of reading and thirty minutes of math. Although B.S. had one disciplinary incident on November 3, 2016, he did not have any further disciplinary incident reports until February of 2017.[4]

---

[3] *See Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F. ("Michael F.")*, 118 F.3d 245, 247 (5th Cir. 1997) (explaining that an IEP is prepared "at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child himself").

[4] At oral argument, B.S.'s counsel cast doubt on the assertion that B.S. did not have any serious behavioral incidents between November and February by alleging that the School District failed to turn over B.S.'s behavioral choice sheets from November through December of 2016. However, the record on appeal contains B.S.'s choice sheets during this time period and they do not document any further behavioral incidents.

No. 22-10443

The parties agree that B.S.'s behavior suddenly deteriorated in February of 2017. In February alone B.S. had five disciplinary incident reports. For context, during this time period, B.S.'s medication was changed, his family, which now included a new baby, moved homes, and a new student joined Ms. Gooch's classroom. Because of B.S.'s rise in behavioral incidents, on February 13, he began attending Ms. Lockamy's kindergarten through second grade classroom for more of the day. On February 28, 2017, Lucy Walter, the School District's diagnostician, initiated a "Behavioral Specialist Request" recommending that the School District conduct a Functional Behavioral Assessment ("FBA") and implement a BIP for B.S.

On March 3, 2017, B.S. had a meltdown. He became agitated and began throwing objects, pushing over desks, and hitting his teachers, resulting in the evacuation of his classroom. His special education teacher, Ms. Gooch, testified that given B.S.'s escalating behavior, she called 911 because she believed it was "in the best interest of the staff members and students on campus." The Waxahachie Police Department responded by dispatching officer Derrick Young to the school.

When Officer Young entered the classroom, B.S. began running towards him and threw a chair at him. After catching the chair, Officer Young restrained B.S. by grabbing his arms and placing him on his stomach while Ms. Kazda, B.S.'s principal, held his head up to keep him from banging it on the ground. At the due process hearing, Officer Young testified that as soon as he walked into the classroom, he knew it was a "very unsafe" situation.

5

No. 22-10443

Because Ms. Kazda and Officer Young were unable to deescalate B.S.'s behavior,[5] Officer Young called for a backup officer. When Officer Mike Lewis arrived, he informed B.S. that if he did not calm down, he would have to place B.S. in handcuffs for his own safety. After B.S. was still unable to calm down, Officer Lewis placed B.S. in handcuffs. Once he was in handcuffs, the officers were able to walk B.S. to the front office where his mother came to pick him up. B.S., his mother, Ms. Kazda, and the officers then debriefed on what happened and the conversation ended with B.S. shaking hands with one of the officers and hugging Ms. Kazda. B.S.'s mother additionally asked Ms. Kazda to schedule an ARD Committee meeting to address the incident.

On March 6, 2017, the School District provided B.S.'s parents with a "Notice of Proposal to Evaluate" which included a request for additional behavioral accommodations (an FBA and a BIP) and a parent training evaluation, all of which required parental consent. B.S.'s parents never provided consent for these evaluations. On March 8, the School District sent B.S.'s parents a notice that an ARD Committee was scheduled for March 20.

The following day, B.S.'s parents filed a request for an IDEA due process hearing, alleging that the School District failed to provide B.S. with a FAPE. For relief, B.S.'s complaint requested: (1) the School District provide B.S. an Independent Educational Evaluation ("IEE"); (2) reimbursement for services privately obtained by B.S.'s parents, including the costs of a hospitalization and counseling; (3) reimbursements for the costs of a summer program; (4) compensatory education services by

---

[5] Officer Young attempted to deescalate the situation by asking B.S. what was going on, why he was angry, and what his mother's name was. He also told B.S. to calm down and to use his words. In response, B.S. yelled that it was "none of [Officer Young's] business" what his mother's name was, and that Officer Young should "shut up."

6

private tutoring; (5) counseling for B.S.; and (6) damages of an "uncertain nature." The School District scheduled a meeting with B.S.'s parents to resolve their due process complaint, but his parents failed to attend. B.S.'s mother left the rescheduled resolution meeting because Ms. Gooch was unable to attend.

On March 18, B.S.'s parents' advocate cancelled the ARD Committee meeting scheduled for March 20. After the meeting was cancelled, Diane Chapell, the School District's director of special education, instructed her team to develop a proposed amendment to B.S.'s IEP that would provide him with additional behavioral accommodations without waiting for a formal ARD Committee meeting. However, B.S.'s parents declined to sign the proposed IEP amendment.

After the March 3 incident, B.S.'s mother kept him out of school for several weeks, partially due to B.S.'s eight-day stay at a behavioral hospital. When he returned to school, the School District moved B.S. into Ms. Lockamy's room full time. On April 19, 2017, B.S. threw a telephone at Melissa McGuire, a behavioral specialist for the School District, and emergency services were called to treat her injuries. In light of this incident, the ARD Committee conducted a Manifestation Determination Review on May 1. The School District provided B.S.'s parents with notice of meeting via email and mail. The night before the meeting, B.S.'s parents' advocate informed the School District that the parents would be unable to attend. After offering B.S.'s parents the option of participating by telephone or rescheduling, the School District proceeded with the Manifestation Determination Review meeting in "light of the serious nature of [B.S.'s] behavior."

At the meeting, the ARD Committee concluded that because a direct relationship between B.S.'s disability and his behavioral outbursts could not

be "ruled out," they would consider his behavior to be a manifestation of his disability. Accordingly, the Committee decided to implement additional behavioral supports in B.S.'s IEP, including the development of a BIP. The Committee sent the minutes from the meeting to B.S.'s parents and noted that if his parents did not consent to these changes, B.S.'s amended IEP could not be implemented until May 9.

On May 2, 2017, B.S.'s teachers physically restrained him after he hit one teacher and threw a chair at another. At the time of this incident, B.S.'s revised IEP had not yet been implemented because the School District had not received consent from B.S.'s parents. After B.S.'s May 2 escalation, he did not have any further significant behavioral issues for the rest of the year. B.S.'s parents enrolled him in a new school district for the 2017-2018 school year.

The hearing officer held the requested due process hearing on May 9-10, 2018.[6] The hearing officer found in favor of the School District and concluded that it had provided B.S. with a FAPE. On October 15, 2018, B.S. appealed the hearing officer's decision in federal district court. He also sued the School District and Principal Kazda under the ADA, § 504 of the Rehabilitation Act, and 42 U.S.C. § 1983. B.S. also included claims under § 1983 and the ADA against the City.

On cross motions for summary judgment, the district court affirmed the hearing officer's decision that the School District provided B.S. with a FAPE. The district court also granted motions to dismiss B.S.'s remaining claims. B.S. timely appealed the district court's order granting summary

---

[6] 20 U.S.C. § 1415(f)(A) ("Whenever a complaint has been received, . . . the parents or the local education agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local education agency . . . .").

judgment to the School District on his IDEA claim and its dismissal of his ADA claim against the City.

## II.   STANDARDS OF REVIEW

As it pertains to B.S.'s IDEA claim, we review a district court's determination as to whether a school district has provided a FAPE as a mixed question of law and fact.[7] The district court's legal conclusions are reviewed *de novo*, while its findings of fact are reviewed for clear error.[8] We review *de novo* mixed questions of law and fact, such as the "district court's decision that a local school district's IEP was or was not appropriate."[9] However, the district court's finding that a student obtained an educational benefit from the school's special education services is a finding of underlying fact reviewed for clear error.[10] Because the IDEA "'creates a presumption in favor of a school system's education plan,' the burden of proof rests on the party challenging the plan."[11]

Under the IDEA, the district court's review of the state hearing officer's decision is "virtually *de novo*."[12] Although the district court must give "due weight" to the hearing officer's findings, the court must ultimately

---

[7] *Klein v. Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012) (citing *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993)).

[8] *R.S. ex rel. Ruth B. v. Highland Park Indep. Sch. Dist.*, 951 F.3d 319, 328 (5th Cir. 2020) (per curiam).

[9] *E.R. ex rel. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 766 (5th Cir. 2018) (internal quotation marks and citation omitted).

[10] *R.S.*, 951 F.3d at 328 (quoting *Klein*, 690 F.3d at 395).

[11] *H.W. ex rel. Jennie W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 462 (5th Cir. 2022) (quoting *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003)).

[12] *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003) (internal quotation marks and citation omitted).

"arrive at its own independent decision based on the preponderance of the evidence."[13]  However, the Supreme Court has cautioned that courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review."[14]  Finally, under this standard, the district court should award "greater deference" to the hearing officer's credibility determinations based on live testimony.[15]

As it pertains to B.S.'s ADA claim, we review the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) *de novo*.[16]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[17]

## III.   DISCUSSION

### A.   The IDEA Claim

We begin with a brief background on the IDEA.  The IDEA "offers States federal funds to assist in educating children with disabilities" in exchange for the State's compliance "with a number of statutory conditions," including the requirement to provide a FAPE to qualifying children with disabilities.[18]  "The primary vehicle"[19] for ensuring that a

---

[13] *R.S.*, 951 F.3d at 328.

[14] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017) (internal quotation marks and citation omitted).

[15] *Lisa M.*, 924 F.3d at 218 (internal quotation marks and citation omitted).

[16] *Elsensohn v. St. Tammany Par. Sheriff's Off.*, 530 F.3d 368, 371 (5th Cir. 2008).

[17] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

[18] *Endrew F.*, 580 U.S. at 390 (citing 20 U.S.C. § 1412(a)(1)).

[19] *Honig v. Doe*, 484 U.S. 305, 311 (1988).

disabled student receives a FAPE is the creation and implementation of an IEP, which ensures that students receive special education and related services that are "tailored to the[ir] unique needs."[20]

The IDEA includes both procedural and substantive requirements. As relevant here, a school district may violate the IDEA by implementing an IEP that is not "reasonably calculated to enable the child to receive educational benefits."[21] To evaluate whether a student's IEP is substantively adequate, this Court employs a four-factor test set forth in *Michael F.* These factors include whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders;' and (4) positive academic and non-academic benefits are demonstrated."[22]

On appeal, B.S. argues that the district court erred in concluding that the School District complied with the substantive requirements of the IDEA. The thrust of B.S.'s argument is that his 2016 IEP was not reasonably calculated to provide him with educational benefits because it did not adequately address his behavioral issues. We review B.S.'s arguments in the course of evaluating whether his IEP satisfies the four *Michael F.* factors.

### 1.    Individualization

B.S. contends that his 2016 IEP was not properly individualized because the ARD Committee did not fully consider the severity of his behavioral issues in the Fall of 2016. As a result, B.S. argues that the

---

[20] *Endrew F.*, 580 U.S. at 391 (quoting *Board of Ed. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982)).

[21] *Rowley*, 458 U.S. at 201.

[22] *Michael F.*, 118 F.3d at 253.

Committee failed to perform an FBA or implement a BIP early enough to address his behavioral issues.

As it pertains to B.S.'s argument that the ARD Committee was unaware of the full extent of his behavioral issues, B.S. points to Ms. Kazda's testimony that she knew of one behavioral incident at the time of the ARD Committee meeting[23] and Ms. Gooch's testimony that she did not reference B.S.'s restraint forms in developing his present levels of academic achievement and functional performance ("PLAAFP").[24] However, B.S.'s IEP, as well as other record evidence, support the district court's finding that the ARD Committee considered the full extent of B.S.'s behavior in developing his 2016 IEP.

Ms. Kazda's testimony that she was only aware of one behavioral incident in the Fall of 2016 does not mean that the full ARD Committee lacked awareness of the extent of B.S.'s behavioral issues. B.S.'s special education teacher, Ms. Gooch, also attended the ARD Committee meeting and was unquestionably aware of B.S.'s behavior, including his restraint referrals.[25] In fact, Ms. Gooch was able to use her first-hand observations of B.S.'s behavior in recommending the new behavioral goals adopted in the 2016 IEP. Additionally, Ms. Chapell, the School District's director of special education, testified that after reviewing B.S.'s 2016 PLAAFP statements and goals, she believed that the ARD Committee was fully aware of B.S.'s

---

[23] Ms. Kazda testified that B.S. only had "one incident in September where he had a hard day." However, on cross-examination, Ms. Kazda acknowledged that B.S. had more than one behavioral incident in September.

[24] Ms. Gooch testified that in listing the data sources that were reviewed in developing B.S.'s PLAAFP, his September 28 restraint form was not listed.

[25] Ms. Gooch testified that she included her "observations from the disciplinary incidents on September 28th and September 29th" in B.S.'s PLAAFP.

behavior. Accordingly, the district court did not clearly err in finding that the record supported the conclusion that the ARD Committee was aware of B.S.'s behavior in the Fall of 2016.

Second, B.S. contends that his IEP was not individualized because it contained "virtually no behavioral support" and was created without the aid of an FBA or the implementation of a BIP. The IDEA requires a school district to "consider the use of positive behavioral interventions and supports, and other strategies" when a child's behavior impedes the child's own learning or that of others.[26] Courts have held that a school district satisfies this requirement, even in the absence of an FBA, in cases where a student's IEP "adequately identifies a student's behavioral impediments and implements strategies to address that behavior."[27]

Here, B.S.'s 2016 IEP contained adequate accommodations to address his behavioral problems. Specifically, his IEP set forth two behavioral goals that required him to work towards: (1) walking in the hallway with his hands not touching the walls and (2) not displaying negative behavior such as "kicking, hitting, running, throwing objects, or refusing to work to seek peer attention instead, [and] when prompted, talk with a staff member, take a break, or use a cool down place." Further, as noted above, B.S.'s IEP included strategies to manage his behavior, and B.S.'s teachers testified that

---

[26] 20 U.S.C. § 1414(d)(3)(B)(i).

[27] *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013); *see also Ruffin v. Houston Indep. Sch. Dist.*, 459 F. App'x 358, 361 (5th Cir. 2012) (per curiam) (unpublished) (rejecting plaintiff's assertion that her daughter's IEP was not individualized because the school failed to conduct an FBA given that the student's IEP "contained accommodations to address . . . [the student's] behavioral problems," including "a behavioral support plan and educational goals tailored to meet" her needs). Although *Ruffin* and other unpublished opinions cited herein are "not controlling precedent" except in limited circumstances, they "may be persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006).

those strategies were helping him.[28]  Accordingly, the district court did not error in concluding that the School District's accommodations and behavioral goals set forth in B.S.'s IEP constituted a sufficiently good faith effort to help him achieve his educational goals in light of his behavioral issues.[29]

With respect to his argument about the need for an FBA and a BIP, B.S. relies on the testimony of Dr. Adiaha Spinks-Franklin and his mother, as well as the fact that his behavior escalated in February of 2017.  Plaintiffs' expert, Dr. Spinks-Franklin, testified that she would have recommended an FBA and a BIP in the Fall of 2016.  Dr. Spinks-Franklin based her testimony on B.S.'s records from the School District and her conversation with B.S.'s mother, but she never met with B.S. or any of his teachers.  B.S.'s mother testified that she did not believe B.S.'s 2016 IEP sufficiently addressed his behavioral issues.  However, aside from testifying generally that additional "behavior support" and "interventions" were necessary, B.S.'s mother offered no specifics about what the School District should have done differently.

The hearing officer heard testimony that contradicts B.S.'s assertion that he needed an FBA and a BIP in the Fall of 2016.  B.S.'s special education teachers, Ms. Lockamy and Ms. Gooch, both testified that B.S. did not need

---

[28] For example, Ms. Gooch testified that in the Fall of 2016, B.S. got to the point where "he could actually verbalize the calming strategy that he needed," such as asking staff to go for a walk or get a drink, and that he was unable to do that at the beginning of the year.  Similarly, Ms. Chapell testified that the behavioral supports in place in B.S.'s 2016 IEP were "fairly effective."  Although she conceded that the program "wasn't perfect because he continued to have some difficulties," she noted that is "pretty normal."  .

[29] *H.W.*, 32 F.4th at 470 (rejecting the plaintiff's argument that the school district "should have exercised other options to dispel any behavioral issues" on the grounds that "our review of an IEP must be limited to whether the IEP is *reasonable*, not ideal").

an FBA or a BIP prior to February of 2017.[30]  Ms. Edmondson, the School District's behavior specialist and B.S.'s first-grade teacher, testified to the same.[31]  In light of the above testimony, the district court found that the hearing officer was entitled to credit the testimony of B.S.'s teachers over the testimony of his mother and Dr. Spinks-Franklin.

In reviewing the record, we find that the district court sensibly followed the hearing officer's reliance on the testimony from B.S.'s teachers, who interacted with him on a daily basis, in concluding that B.S.'s behavior was being adequately managed without an FBA and a BIP until February of 2017.[32]  In light of the deference we afford to hearing officers' credibility determinations based on live testimony,[33] we agree with the district court's

---

[30] Ms. Gooch testified that she agreed with the ARD Committee's determination in October of 2016 that B.S. did not need a BIP.  Ms. Lockamy testified that prior to February 27 she did not see a need to refer B.S. for an FBA or a BIP and that she "hadn't seen any major aggressive behaviors from B.S." in the Fall.

[31] Ms. Edmondson, who has a master's degree in autism, testified that during the Fall semester she did not see a need for any changes to B.S.'s IEP, and that in her opinion an FBA or a BIP was not necessary for B.S. prior to the incidents occurring in February.

[32] *See Michael F.*, 118 F.3d at 255 (finding that "the testimony . . . [of] individuals who had direct and frequent contact with Michael . . . provides substantial support for the district court's determination that the October 4, 1993 IEP was reasonably calculated to, and in fact did, produce meaningful educational benefits").

[33] *Lisa M.*, 924 F.3d at 218 (noting that the district court should award "greater deference" to the hearing officers' credibility determinations based on live testimony); *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001) (noting that in light of "[t]raditional notions of the deference owed to a fact finder," a state hearing officer "who receives live testimony is in the best position to determine issues of credibility"); *P.P. v. Nw. Indep. Sch. Dist.*, 839 F. App'x 848, 858 (5th Cir. 2020) (per curiam) (unpublished) ("The hearing officer's reliance on testimony from P.P.'s teachers, as opposed to testimony from P.P., reflects an implicit credibility determination that is owed deference." (citing *Lisa M.*, 924 F.3d at 218)).

conclusion that an FBA and a BIP were not necessary in the Fall of 2016 to ensure that B.S.'s IEP was sufficiently individualized.

Finally, the fact that B.S.'s behavior escalated in February of 2017 by itself is not conclusive evidence that his 2016 IEP was not sufficiently individualized. An IEP need not be "perfect" nor "insulate a child from experiencing hardships" in order to comply with the IDEA.[34] Instead, the IDEA only guarantees a child a "basic floor" of opportunity that meets a child's "unique needs" with "services that will permit him to benefit from the instruction."[35] Here, that is exactly what B.S.'s 2016 IEP provided.

B.S.'s teachers testified that they were generally able to manage his behavior under the 2016 IEP[36] and when that changed in February of 2017 the School District responded by: (1) requesting consent for an FBA and a BIP, (2) scheduling an ARD Committee meeting, and (3) altering B.S.'s educational setting. This type of responsiveness to changes in a student's behavior is what the IDEA requires to ensure that an IEP is sufficiently individualized.[37] Therefore, the district court correctly concluded that the first *Michael F.* factor weighs in favor of the School District.

---

[34] *A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 691 (5th Cir. 2020).

[35] *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010) (internal quotation marks and citation omitted).

[36] *M.M. v. Dist. 0001 Lancaster Cnty. Sch.*, 702 F.3d 479, 487 (8th Cir. 2012) ("It is 'largely irrelevant' if the school district could have employed 'more positive behavioral interventions' as long as it made a 'good faith effort' to help the student achieve the educational goals outlined in his IEP." (quoting *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 639 (8th Cir. 2003)).

[37] *See H.W.*, 32 F.4th at 465 (finding the student's IEP was "undoubtedly individualized" because the ARD Committee "showed that it was vigilant in its evaluation, observation, and assessment of H.W. and that it routinely updated H.W.'s IEP to reflect its individualized findings"); *R.S.*, 951 F.3d at 332 (noting that each time the student fell the school district "implemented new measures that were intended to prevent the fall from

### 2.    Least Restrictive Environment

Under the IDEA, a school must offer special education classes in the "least restrictive environment" appropriate for a child's needs. "Although the IDEA contains a preference for mainstreaming children, that preference is not absolute."[38]   A school district does not run afoul of the IDEA's preference for mainstreaming in cases where a student cannot be educated "satisfactorily in the regular education classroom."[39]

B.S. contends that his 2016 IEP violated the least restrictive environment requirement by removing him from general education math and placing him in a classroom with younger students.  The district court rejected this assertion, finding that there were valid reasons supporting the School District's decision to move B.S. out of general education math.  We agree.

There is substantial support in the record, including testimony from B.S.'s teachers,[40] to support the district court's finding.  Notably, B.S.'s 2016 IEP states that his "present level of educational performance" is significantly below his grade placement, and that his IEP could not be implemented in the general education setting "without eliminating essential components of the general curriculum."  In situations like this, we have refused to require general education teachers to "modify the[ir] curriculum

---

reoccurring" and that although "these measures were not 100% successful does not establish that . . . [the student's] IEP was not reasonably calculated to allow him to learn").

[38] *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 771 (5th Cir. 2018) (citing 20 U.S.C. § 1412(a)(5)).

[39] *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1050 (5th Cir. 1989).

[40] B.S.'s special education teacher, Ms. Gooch, testified that general education math was causing B.S. frustration.  Ms. Lockamy, B.S.'s other special education teacher, also testified that B.S. did better with the younger group of students because he "felt like a leader and a role model."  .

beyond recognition . . . in the name of mainstreaming."[41] Such a requirement would be "unfair to the rest of the class" because although "regular education instructors must devote extra attention to their [disabled] students, we will not require them to do so at the expense of their entire class."[42]

Additionally, the School District took steps to ensure that B.S. had as much access as possible to his general education peers. B.S. continued to attend "specials" in a general education setting and his placement in Ms. Lockamy's classroom with younger students allowed him to work on his own goals while being in a class with other students. We therefore find that the district court correctly held that the second *Michael F.* factor weighed in favor of the School District.

### 3.    Collaboration

B.S. asserts that there was no coordinated response by the School District to address his behavioral issues. As evidence of this alleged lack of coordination, B.S. contends that his IEP goals were not shared with Ms. Lockamy and that Ms. Gooch kept the severity of his behavior to herself. The district court rejected these assertions and found that there were "many examples in the record of key stakeholders for [the School District] in this case coordinating and collaborating."

B.S.'s assertions about a lack of coordination are not supported by the record. First, Ms. Lockamy's testimony at the due process hearing

---

[41] *See Daniel R.R.*, 874 F.2d at 1050 (finding that the school district's decision to remove a student from the general education classroom did not violate the IDEA because the student's disability "slowed his development so that he is not yet ready to learn the developmental skills offered in Pre-kindergarten" and therefore his teacher "would have to alter 90 to 100 percent of the curriculum to tailor it to" the student's needs).

[42] *Id.* at 1051.

contradicts B.S.'s assertion that she did not have access to his IEP.[43]  Ms. Lockamy testified that she had access to B.S.'s goals "on the system" and that she had "long conversations" about his goals with Ms. Gooch.  Second, Ms. Gooch testified that although she did not specifically relay her concerns over B.S.'s behavior to other school personnel in February of 2017, she did ensure to document his behavior and that these documents were available to others.  The district court did not clearly err in finding that B.S.'s IEP was created and implemented in a coordinated manner by key stakeholders.  Accordingly, the third *Michael F.* factor also weighs in favor of the School District.

### 4.    Demonstrated Benefits

The last *Michael F.* factor asks whether B.S. demonstrated positive academic and non-academic benefits under his IEP.  This Court has emphasized that "evidence of an academic benefit militates in favor of a finding that an IEP is appropriate."[44]

The district court agreed with the hearing officer that B.S. was making appropriate progress under the circumstances, and that the benefits he received from his IEP were meaningful.  The court noted that B.S.'s teachers testified in detail about B.S.'s "steady progress, albeit slow progress."[45]

---

[43] At the hearing, Ms. Lockamy testified that when B.S. came to her in October for reading and math, she only had B.S.'s IEP goals that related to those subjects, but that when he began coming to her classroom more in February of 2017, she received a hard copy of all of his IEP goals.

[44] *Klein*, 690 F.3d at 399 (citing *Adam J.*, 328 F.3d at 810).

[45] For example, Ms. Lockamy testified that during the year B.S. "moved from very, very beginning kindergarten reading level to almost an end-of-the-year kindergarten reading level."  She also testified that B.S. improved in the following areas: reading comprehension, spelling, social skills instruction, and math skills.  This conclusion is

No. 22-10443

Further, Ms. Lockamy described in depth B.S.'s academic improvement by comparing his test scores from the beginning and the end of his third-grade year.

B.S. discounts the district court's findings of progress as *de minimus* because his progress was below what is expected of his grade level. However, "[w]hether advancement is so trivial or minor as to qualify as *de minimis* must be evaluated in light of the child's circumstances, and a court may determine that aiming for small amounts of progress is appropriately ambitious given a child's unique needs."[46] The district court therefore correctly relied on B.S.'s teachers' testimony, as well as the results of B.S.'s testing, to conclude that he was making sufficient progress in light of his circumstances.[47]

As far as non-academic benefits, the district court also found that B.S. made progress on his behavioral goals to walk in the hallway without touching the wall and being able to verbalize calming strategies. While it is undisputed that B.S. continued to struggle with behavioral issues in the Spring of 2017, we again reiterate that an IEP must simply "aim to enable the child to make progress," and that the "standard is not perfection."[48] In short, the IDEA

---

further supported by Ms. Carroll's testimony that B.S.'s achievement scores in third grade were "consistent" with his cognitive ability."

[46] *R.S.*, 951 F.3d at 337.

[47] *See id.* at 336-37 (finding that plaintiff's IEP provided sufficient academic benefits after thoroughly reviewing his academic record and finding that although he "did not display significant progress" in some areas, he displayed progress in other areas, as shown by comparisons between his FIE scores administered three years apart).

[48] *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 769 (5th Cir. 2018) (internal quotation marks and citation omitted).

does not entitle B.S. to an IEP that remediates his behavioral problems in every instance.[49]

Furthermore, despite B.S.'s behavioral problems, there is support for the district court's finding that B.S. received at least *some* non-academic benefit from his IEP. In addition to making progress on his behavioral goals, B.S. had no significant behavioral issues from November through February,[50] and after his IEP was amended in May, he was able to finish the school year without any further problems. Also, in B.S.'s 2016 FIE, the LSSP noted that he had "made marked strides in behavior since the time of his initial autism evaluation." Therefore, we find that the district court did not clearly error in finding that B.S. achieved at least some academic and nonacademic benefits as a result of his IEP.

In sum, this case is very fact specific given that the issues raised by B.S. on appeal mostly require our review of credibility determinations made by the hearing officer. After careful review of the record, we conclude that those findings, credited by the district court, generally control the outcome of this case. Accordingly, because all four *Michael F.* factors weigh in favor of the School District we affirm the district court's order dismissing B.S.'s IDEA claim.

## B.    The ADA Claim

Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in

---

[49] *See Klein*, 690 F.3d at 397-88 (explaining that the IDEA's "ultimate statutory goal" is "educational benefit, not solely disability remediation").

[50] Ms. Edmondson testified that B.S.'s Fall semester was "fairly smooth" despite his "few behavior incidences" at the end of September. She also testified that after B.S. returned after Christmas "he was doing really great" and that his teachers had "smooth sailing until February."

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[51] In addition to prohibiting disability-based discrimination, the ADA also "impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals."[52]

To recover compensatory damages for a violation of Title II, B.S. must show "that the discrimination was intentional."[53] Although this Court has not "delineate[d] the precise contours"[54] of the intentionality standard, we have required "something more than 'deliberate indifference.'"[55] In determining what conduct rises to this level, we have emphasized that a "critical component of a Title II claim for failure to accommodate . . . is proof that 'the disability and its consequential limitations were known by the [entity providing public services.]'"[56] In short, "intentional discrimination requires at least actual knowledge that an accommodation is necessary."[57]

The burden falls on the plaintiff "to specifically identify the disability and resulting limitations," and to request the necessary accommodation.[58]

---

[51] 42 U.S.C. § 12132.

[52] *Bennett-Nelson v. La Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005); *see also Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015) (per curiam) (unpublished); *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015).

[53] *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (citing *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002)).

[54] *Id.* at 575.

[55] *Id.* (quoting *Delano-Pyle*, 302 F.3d at 575).

[56] *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017) (quoting *Jin Choi*, 633 F. App'x at 215).

[57] *Smith v. Harris Cnty.*, 956 F.3d 311, 319 (5th Cir. 2020) (citing *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020)).

[58] *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

No. 22-10443

However, if a plaintiff fails to request an accommodation, "he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents."[59]   We have described this latter method as a "narrow exception."[60]

B.S. alleges that the police officers who responded to Ms. Gooch's 911 call intentionally discriminated against him by failing to accommodate his disabilities of autism and a speech impairment.  It is undisputed that B.S. never asked the officers for an accommodation.  Thus, in order to survive a motion to dismiss, B.S. must plausibly allege that his disabilities and resulting limitations, as well as the reasonable accommodations, were open and obvious to the officers.  The district court found that even assuming B.S.'s disabilities were open and obvious, B.S. did not allege that the limitations resulting from his disabilities and the required reasonable accommodations were open, obvious, and apparent.

Assuming *arguendo* that B.S.'s disabilities were open and obvious, we agree with the district court that B.S. failed to plausibly allege that the limitations from his disabilities and the necessary reasonable accommodations were open, obvious, and apparent to the officers. Regardless of whether Officer Young knew B.S. had a disability after asking Ms. Kazda if B.S. "was diagnosed,"[61] "knowledge of a disability is different

---

[59] *Windham*, 875 F.3d at 237 (quoting *Taylor*, 93 F.3d at 164).

[60] *Id.* at 239.

[61] B.S. alleges that Officer Young knew he had a disability because he asked Ms. Kazda "if he [was] diagnosed?"  Ms. Kazda did not respond.

from knowledge of the resulting limitation" and "it certainly is different from knowledge of the necessary accommodation."[62]

B.S.'s complaint is completely devoid of any allegation that the officers understood what they needed to do to accommodate B.S. and instead relies on conclusory assertions that the officers failed to take "reasonable actions." What exactly these "reasonable action[s]" would have included is never spelled out,[63] which further undermines B.S.'s contention that the appropriate accommodations that would keep both himself and others safe were open and obvious to the officers in the moment.

The facts alleged in B.S.'s complaint, confirmed by the officers' body camera footage,[64] strongly support the district court's finding. Unlike in *Phillips ex rel. J.H. v. Prator*,[65] relied on by B.S., his conduct did not make it obvious that he had autism or that he was unable to comprehend the situation.[66] To the contrary, B.S. provided coherent, albeit uncooperative,

---

[62] *Windham*, 875 F.3d at 238.

[63] At oral argument, counsel for B.S. was unable to definitively explain what additional actions the officers could have reasonably taken.

[64] In considering a motion to dismiss, the court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference," *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (citation omitted), and is central to the party's claims, *New Orleans City v. Ambac Assur. Corp.*, 815 F.3d 196, 200 (5th Cir. 2016). Here, B.S. refers to the body camera footage in his complaint, and the footage is central to his ADA claim. We therefore find it appropriate to consider the body camera footage in reviewing B.S.'s claim. *See Phillips*, 2021 WL 3376524, at *1 n.1 (considering video footage that depicted the encounter between the student and the deputy because the plaintiff referenced the video in her complaint and it was central to her ADA claims).

[65] No. 20-30110, 2021 WL 3376524 (5th Cir. Aug. 3, 2021) (unpublished).

[66] *Id.* at *1 (finding that it was plausible the deputy knew an accommodation was necessary because he watched J.H. stand motionless in the hallway with his head down and

answers to the officers' questions. And unlike the deputy in *Phillips* who watched J.H.'s behavior for several minutes, neither officer here had a chance to observe B.S.'s behavior before having to engage with him. Finally, the officers' efforts to interact with B.S. were far less extreme than the response by the deputy in *Phillips*.[67] Far from tasing a student, the officers' actions here indicate that they were doing their best to deescalate the situation by calmly asking B.S. questions and gently handcuffing him to provide safety to him and those in the room. Given these factual differences, we find B.S.'s reliance on *Phillips* to be unpersuasive.

Accordingly, the district court correctly held that B.S. alleged insufficient facts to show that the officers understood the limits imposed by his disabilities and failed to accommodate them.

## IV.    CONCLUSION

For the above reasons, we AFFIRM the district court's grant of summary judgment against B.S. on his IDEA claim and its dismissal of B.S.'s ADA claim under Rule 12(b)(6).

---

his fingers in his ears which constituted "clear signals that J.H. did not comprehend what was happening").

[67] *Id.* (noting that when J.H. kicked a school administrator, the deputy tased him).